IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**AUDUBON SOCIETY OF**
**PORTLAND**, et al.,

|  |
|---|
| Case No. 1:17-cv-00069-CL (lead) |
| Case No. 1:17-cv-00098-CL (trailing) |
| Case No. 1:17-cv-00468-CL (trailing) |
| Case No. 1:17-cv-00531-CL (trailing) |

Plaintiffs,

v.

**RYAN ZINKE,** *et al.*,

Defendants.

**TULELAKE IRRIGATION DISTRICT,** et al.,

Defendant-Intervenors.

**REPORT AND**
**RECOMMENDATION**

CLARKE, Magistrate Judge.

This case comes before the Court on cross-motions for summary judgment in this

consolidated litigation involving challenges to a Comprehensive Conservation Plan ("CCP")

adopted by the United States Fish and Wildlife Service (the "Service"). (##98, 102, 110, 118,

143, 145, 146, 148, 157, 159, 161, 162).  The CCP applies to five National Wildlife Refuges

within the Klamath Basin National Wildlife Refuge Complex.  Plaintiffs challenge the Service's

decision to adopt the CCP, claiming that it violated the National Environmental Policy Act

("NEPA"), the National Wildlife Refuge System Improvement Act ("Refuge Act"), the Kuchel

Act of 1964 ("Kuchel Act"), and the Clean Water Act ("CWA").

Also pending before the Court is Audubon's Motion for Judicial Notice (#109),

Defendant-Intervenor Tulelake Irrigation District's Motion to Strike (#130), Supplemental

Motion to Strike (#196), and Motion to Supplement the Administrative Record (#147).

For the reasons provided below, this Court recommends ruling in favor of the Service on

all claims.

**LEGAL STANDARDS**

I.    **National Environmental Procedure Act**

NEPA "is our basic national charter for protection of the environment."  40 C.F.R. §

1500.1(a).  "NEPA requires that, 'to the fullest extent possible . . . all agencies of the Federal

Government shall' complete an environmental impact statement (EIS) in connection with 'every

recommendation or report on proposals for legislative and other major Federal actions

significantly affecting the quality of the human environment.'"  *San Luis & Delta-Mendota*

*Water Auth. v. Jewell*, 747 F.3d 581, 640-41 (9th Cir. 2014) (alteration in original) (quoting 42

U.S.C. § 4332(2)(C)).  "In addition to the proposed agency action, every EIS must '[r]igorously

explore and objectively evaluate all reasonable alternatives' to that action.  40 C.F.R. §

1502.14(a).  The analysis of alternatives to the proposed action is 'the heart of the environmental

impact statement.'"  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642

(9th Cir. 2010) (second citation omitted).

The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 3695 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

However, "NEPA itself does not mandate particular results, but simply the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351. As such, "NEPA does not require particular environmental standards or mandate that agencies achieve substantive environmental results." *Greater Yellowstone Coal v. Lewis*, 628 F.3d 1134, 1150 (9th Cir. 2010). In reviewing agency decisions, courts are generally "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (internal quotation marks and citation omitted).

## II.    Administrative Procedure Act

Judicial review of agency decisions under NEPA is governed by Section 706 of the Administrative Procedure Act ("APA") and may be resolved through motions for summary judgment. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir.2004) ( "Because the statutes . . . do not contain separate provisions for judicial review, our review is governed by the APA"); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir.2002) ("We review claims brought pursuant to . . . NEPA under the standards set out in the [APA]").

The APA allows the reviewing court to set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Review under the APA is "searching and careful." *Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004). The court must ensure that the agency took a "hard look" at the environmental consequences of its proposed action. *Oregon Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). However, the court may not substitute its own judgment for that of the agency. *Ocean Advocates*, 402 F.3d at 858. It must presume the agency acted properly and affirm the agency when "a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

## III.    Statutory Interpretation of the Kuchel Act and the Refuge Act

Judicial deference to an agency's decision extends to an agency's interpretation of a statute it administers. *United States v. Mead Corp.*, 533 U.S. 218, 227-31 (2001); *Chevron*

*U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). Under *Chevron*, if Congress has "directly spoken to the precise question at issue," Congress' intent must be given effect. *Chevron*, 467 U.S. at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the Court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *Nat. Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1297 (9th Cir. 1992). "A very good indicator of delegation meriting *Chevron* treatment [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead*, 533 U.S. at 229. "An agency interpretation that enjoys *Chevron* status must be upheld if it is based on a reasonable construction of the statute." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1143 (9th Cir. 2007).

## INTRODUCTION

### I.    Background Summary

The Klamath Basin National Wildlife Refuge Complex ("Klamath Refuge Complex") includes six separate refuges, each protecting important habitat in the Klamath Basin.  Perhaps best known for their wetlands, the refuges are in fact highly diverse, encompassing grasslands, conifer forest, open water, and sagebrush steppe[1] uplands.  These habitats support varied and abundant populations of native wildlife, including a number of special status species.

Congress passed the Refuge Act to set aside lands designated as wildlife refuges for "the conservation, management, and where appropriate, restoration, of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).  The Refuge Act governs the management

---

[1] Sagebrush steppe is a type of shrub-steppe, a plant community or area characterized by the presence of shrubs, and usually dominated by sagebrush.

of all refuges and requires the Service to prepare a management plan, referred to as a

Comprehensive Conservation Plan ("CCP"), for each refuge. *Id.* at § 668dd(e)(1)(A), (B).

The CCP identifies the purposes for each refuge and establishes the goals, objectives, and

strategies for each refuge to guide the Service's management actions toward achieving each

refuge purpose. 50 C.F.R. § 25.12 (2014). The CCP is intended to "maintain and, where

appropriate, restore the ecological integrity of each refuge and the Refuge System." *Id.* "Upon

completion of a [CCP], the Secretary shall manage the refuge or planning unit in a manner

consistent with the plan and shall revise the plan at any time if the Secretary determines that

conditions that affect the refuge or planning unit have changed significantly." 16 U.S.C. §

668dd(e)(1)(E). The CCP is a "programmatic document intended to analyze proposed actions on

a conceptual level," and contemplates subsequent project-level planning, known as "step-down"

planning, where additional studies would be conducted, additional baseline data would be

gathered, and the appropriate project-level NEPA documentation prepared. AR 3099. "Step-

down planning would also include a public involvement component similar to that provided

during the CCP process." *Id.*

> The purpose of developing the CCP for the refuges is to provide managers with a
> 15-year strategy for achieving refuge purposes and contributing to the mission of
> the NWRS, consistent with the sound principles or fish and wildlife conservation
> and legal mandates. The CCP is flexible and will be revised periodically to ensure
> that its goals, objectives, strategies, and timetables are valid and appropriate.

AR 3099.

To comply with NEPA, the Service incorporated into the CCP an Environmental Impact

Statement ("EIS"). AR 003098; AR 003796. An EIS contains "a detailed statement of the

expected adverse environmental consequences of an action, the resource commitments involved

in it, and the alternative to it." *Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 (1976). Chapter IV

of the CCP describes the range of alternatives considered by the Service, Chapter V describes the affected environment, and Chapter VI describes the environmental consequences.

Tule Lake, Lower Klamath, Clear Lake, and Upper Klamath Refuges within the Klamath Refuge Complex are also governed by the Kuchel Act. The Kuchel Act was passed by Congress as a legislative compromise between agricultural interests (wanting the lands sold to the public) and conservationist interests (wanting protection of waterfowl habitat). The Kuchel Act requires the Secretary of the Interior to administer lands "for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith." 16 U.S.C. § 695I. The Service interpreted its obligations under both the Kuchel Act and the Refuge Act to require compatibility determinations to assess whether agricultural use (farming, grazing, and haying) on the Klamath Refuge Complex is consistent with National Wildlife Refuge System mission and the purposes of each individual refuge.

In 2010, the Service initiated a process to develop the first ever CCP for the Klamath Refuge Complex. AR 3130. In May 2016, the Service issued a draft CCP/EIS for five of the six refuges: Lower Klamath, Clear Lake, Tule Lake, Upper Klamath, and Bear Valley National Wildlife Refuges. The draft CCP was made available for public review and comment, and two public meetings were held in Klamath Falls, Oregon. AR 3098. The Service issued a final draft of the CCP on December 6, 2016. AR 38173-39867. On January 13, 2017, the Service issued its Record of Decision ("ROD") for the CCP, where it selected the preferred alternatives for the different refuges. AR 4-84. The CCP, for the first time, adopts a formal plan for managing the refuges within the Klamath Refuge Complex.

On January 17, 2017, Audubon Society of Portland ("Audubon") filed its Complaint (#1) challenging the CCP. Three other plaintiff groups, Western Watersheds Project ("WWP"),

Center for Biological Diversity ("CBD"), and Tulelake Irrigation District ("TID") along with other agricultural groups, filed complaints also relating to the CCP. On April 17, 2017, the four cases were consolidated (#31). Although the parties make separate arguments against the CCP, Audubon, WWP, and CBD may be referred to collectively throughout this opinion as the "Conservation Plaintiffs." TID and the other agricultural groups that filed suit together are referred to as the "Agricultural Plaintiffs." On January 11, 2018, the Service lodged its Second Corrected Administrative Record (#82), containing over 120,000 pages of material.

## II.    Impacts of the Refuge Act and the Kuchel Act

The purpose of the Refuge Act is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States." 16 U.S.C. § 668dd(a)(2). Each refuge must be managed to fulfill this mission, as well as the specific purposes for which each refuge was established. *Id.* § 668dd(a)(3)(A). Purposes of a refuge are those "derived from the law, proclamation, Executive Order," or other means of establishing or expanding a refuge. *Id.* § 668ee(10).

The Refuge Act mandates that the Service shall not allow any use of a refuge "unless [the Service] has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A). A "compatible use" is any use of a refuge that, based on "sound professional judgment, will not materially interfere with or detract from the fulfillment of the mission of the System or the purpose of the refuge." *Id.* § 668ee(1); 50 C.F.R. § 25.12. Sound professional judgment means "a finding, determination, or decision that is consistent with the principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge] Act and other applicable laws." 16 U.S.C. § 668ee(3). The Service

may only authorize a public or private economic use of a refuge if the use "contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1.

In making a Compatibility Determination, the Service must consider the anticipated impacts of the use on the refuge's purpose and on the mission of the National Wildlife Refuge System. *Id.* § 26.41(a)(8). The Service must consider direct impacts of the use, indirect impacts associated with the use, and cumulative impacts including "uses of adjacent lands or waters that may exacerbate the effects of the refuge use." 603 FW §§ 2.11(B)(3), 2.12(A)(8)(c); AR 64528, AR 64532. Uses that are reasonably anticipated "to reduce the quality or quantity or fragment habitats on a national wildlife refuge will not be compatible." *Id.* § 2.5(A); AR 64518. When a use is not compatible, the Service must eliminate or modify the use as expeditiously as practicable. 16 U.S.C. § 668d(d)(3)(B)(vi); 50 C.F.R. § 26.41(d). In order for a Compatibility Determination to be valid, it must "[d]escribe the specific areas of the refuge that will be used: habitat types and acres involved [and] key fish, wildlife, and plants that occur in or use that habitat." 50 C.F.R. § 2.12(A)(6)(b); AR 64530.

The Refuge Act applies to all refuges within the United States, whereas the Kuchel Act applies to only a few refuges—Tule Lake, Lower Klamath, Clear Lake, and Upper Klamath Refuges. The Kuchel Act particularly impacts the Lower Klamath Refuge and Tule Lake Refuge. The area within the surrounding Lower Klamath and Tule Lake Refuges were historically subjected to extensive draining and "reclamation" for agricultural development. AR 65586. Both refuges were established by Executive Order as a preserve and breeding ground for native birds, but the refuges were also within the boundaries of the federal Klamath Reclamation Project, which is managed by the Bureau of Reclamation. AR 3143. Wildlife conservation is

not one of the designated purposes of the Klamath Reclamation Project. Therefore, despite being granted the protected status of a wildlife refuge, the lands were subject to further draining and homesteading for reclamation purposes. By the mid-1950s approximately 5,600 acres of Lower Klamath Refuge and 15,300 acres of Tule Lake Refuge were leased to private farmers through the Bureau of Reclamation. AR 65591; AR 65595. The Bureau proposed opening the refuge lands for further homesteading and transfer to private ownership, which sparked intense debate over the future of the refuges. AR 3144; AR 3153. This debate led to the enactment of the Kuchel Act. However, though the Kuchel Act relieved some confusion as to how the refuges would be managed, the Klamath Reclamation Project is still in place and greatly impacts water availability and priority for the refuges.

Through the Kuchel Act, the United States retained federal ownership over the refuges and dedicated the lands to wildlife conservation, while allowing farmers to continue to lease lands within the refuges for agricultural purposes. The Kuchel Act explicitly states that "all lands owned by the United States lying within the Executive Order boundaries of the Tule Lake National Wildlife Refuge [and] the Lower Klamath National Wildlife Refuge . . . are hereby dedicated to wildlife conservation." 16 U.S.C. § 695k; AR 4550. The Kuchel Act requires that the Service administer the refuges "for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith." 16 U.S.C. § 695l. The Kuchel Act further states that "[t]he Secretary shall, consistent with proper waterfowl management, continue the present pattern of leasing . . . for the growing of grain, forage, and soil-building crops." 16 U.S.C. § 695n. The Kuchel Act does not define many of the terms used, including "proper waterfowl management," leaving such terms open to agency interpretation.

## DISCUSSION

### I.    <u>Agricultural Plaintiffs' Motion for Summary Judgment</u>

This section will address the challenge by Tule Lake Irrigation District, Klamath Water Users Associate, Four H Organics, and other Agricultural Plaintiffs (collectively "Agricultural Plaintiffs") to the CCP/EIS.  For the following reasons, this Court recommends that the Agricultural Plaintiffs' Motion for Summary Judgment (#110) be DENIED.  The Service's Cross-Motion for Summary Judgment (#161), and Audubon's Cross-Motion for Summary Judgment (#157) should be GRANTED.

#### a.    NEPA

Audubon contends that the Agricultural Plaintiffs lack standing to maintain their claims under NEPA.  The Agricultural Plaintiffs contend that the Service violated NEPA by (1) failing to consider the possibility that restrictions on agriculture in the lease lands will result in leaseholders abandoning the use of lease lands on the Refuges and (2) failing to consider the consequences of non-irrigation and fallowing[2] on abandoned lease lands.

##### i.    Standing

To establish Article III standing, "a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *WildEarth Guardians v. U. S. Dep't of Agric.*, 975 F.3d 1147, 1154 (9th Cir. 2015) (internal quotation marks and citation omitted).  In addition to Article III standing, a plaintiff must establish prudential standing.  "The prudential standing analysis examines whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings

---

[2] Fallowing refers to a piece of land that is normally used for farming but that is deliberately left with no crops for a season or more.

suit." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) (internal quotation marks and citation omitted).

In this case, Audubon contends the Agricultural Plaintiffs lack prudential standing because their claims rely entirely on economic harms and therefore fall outside of the "zone of interests" protected by NEPA. NEPA does not provide a private right of action and so a plaintiff challenging agency action based on NEPA must do so under the APA. *Ashley Creek Phosphate Co.*, 420 F.3d at 939. For prudential standing, the APA requires that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," and so the APA "grants standing to a person aggrieved by agency action within the meaning of the relevant statute." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (internal quotation marks and citations omitted).

This "zone of interests" test "is not meant to be especially demanding." *Clark v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987). "In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

The Ninth Circuit has "long described the zone of interests that NEPA protects as being environmental," and has "consistently held that purely economic interests do not fall within NEPA's zone of interests." *Ashley Creek Phosphate Co.*, 420 F.3d at 940; *see also Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency

decisions."). "Therefore a plaintiff who asserts purely economic injuries does not have standing to challenge an action under NEPA." *Nev. Land. Action Ass'n*, 8 F.3d at 716.

In this case, the Agricultural Plaintiffs rely on a series of Declarations from their members to establish standing (##112, 113, 114, 115, 116, 117). In his Declaration (#112), Ryan Hartman explains that he is a co-owner of an LLC that grows crops on the lease lands of Tule Lake and Lower Klamath. Hartman asserts that "[l]imitations on lease land farming from that decision [the CCP/EIS and ROD] would reduce the area available for farming, harming our farm because necessary farming practices would become impracticable or uneconomical, and otherwise impair our operations and viability." Hartman does not discuss any harms not directly tied to the LLC's income and business viability. Tricia Hill's Declaration (#113) complains of the same injury using identical language. The Declaration of Marshall Stauton (#115) describes Stauton's use of the lease lands to raise the money to purchase private farmland and affirms that "[l]imitations on lease land farming resulting from that decision would have adverse effects on me, my family, our business interests, our employees and their families, and the regional rural economy that TGA [Tulelake Growers Association] seeks to preserve." The Declaration of Walter Woodhouse (#116) affirms that limitations on lease land farming "would reduce the area available for farming, harming our farm because necessary farming practices would cause loss of crop production, income, and jobs." Scott White's Declaration (#117) affirms that the decision "will result in decreased revenue and operational difficulties for KWUA [Klamath Water Users Association]'s members . . . Limitations on farming, including new lease terms requiring deviations from agricultural practices consistent with the region, will harm KWUA and its members and KWUA's interests due to loss of crop production, farm income, lost jobs, and the

overall negative effect on the local economy." These Declarations consistently assert only economic interests.

The only Declaration that includes any suggestion of an injury not tied to economic interests is that of Brad Kirby (#114). Like the other declarants, Kirby asserts that that any reduction or curtailment of lease land farming would reduce productivity, "thereby reducing the total amount of lease revenue generated and then received by TID [Tulelake Irrigation District]." Kirby asserts that "if water deliveries were discontinued on the lease lands, TID's ability to maintain water conveyance systems within the public lease lands would be severely impaired due to excessive weed growth and degradation of the system's earthen canals, dikes, and roads." There is, however, no evidence of any plan to discontinue water delivery to the lease lands and the Agricultural Plaintiffs have argued forcefully that the Service has no authority to redirect or reallocate water deliveries on the Refuges.

There are situations where the Ninth Circuit has found NEPA standing for plaintiffs asserting harms that are primarily economic in nature. *See, e.g., Ranchers Cattlemen Action Legal Fund United Stock Growers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078 (9th Cir. 2005) ("A plaintiff can, however have standing under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are causally related to an act within NEPA's embrace.") (internal quotation marks and citation omitted). For instance, in *Douglas Cnty. v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), a county sued over agency decisions that impacted the county's proprietary interest in its lands, which were adjacent to the federal land in question. *Id.* at 1501. However, in *Douglas Cnty.*, the county had submitted a declaration complaining that "[b]y failing to properly manage for insect and disease control and fire, the federal land management practices threaten the productivity *and*

*environment* of the adjoining [county] lands." *Id.* (internal quotation marks and citation omitted, emphasis added). The Ninth Circuit found that this statement described "concrete plausible interests, within NEPA's zone of concern for the environment, which underlie the County's asserted procedural interests." *Id.* Similarly, in *Churchill Cnty. v. Babbitt*, 150 F.3d 1072 (9th Cir. 1998), *overruled on other grounds Wilderness Soc'y v. U.S. Forest Serv.*, 63 F.3d 1173 (9th Cir. 2011), the Ninth Circuit found that a county's claim fell within NEPA's zone of interests because the county alleged "that the environmental health of their lands and water supply is threatened by Defendants' actions." *Id.* at 1081. In this case, the Agricultural Plaintiffs' Declarations only concern diminished productivity and economic harm, with no discussion of environmental impacts or environmental consequences.

The Agricultural Plaintiffs suggest that their claims fall within the zone of interest because their economic harm is linked to or intertwined with the physical environment covered by the Service's decision. Judge Hernandez considered and rejected a similar argument in *Thompson Metal Fab, Inc. v. U.S. Dep't of Transp.*, 289 F.R.D. 637 (D. Or. 2013). In that case, a manufacturer complained that the planned construction of a bridge over the Columbia River would interfere with the manufacturer's ability to ship its products downstream. *Id.* at 639. The manufacturer only complained of economic harm, but argued that its claims fell within NEPA's zone of interests because the effects of the bridge project "are directly related to [the manufacturer's] use of the environment and (lost) productivity that will result from the project." *Id.* at 642. Judge Hernandez rejected that argument: "Suffice it to say, I do not read *Ashley Creek*, or any other authority cited by Thompson, as supporting the determination that Thompson's purely economic interest falls within NEPA's zone of interest merely because it uses the Columbia River to further its economic interest or because its 'productivity' would be

adversely affected by the CRC Project." *Id.* at 642. The Court finds Judge Hernandez's reasoning persuasive.

The Agricultural Plaintiffs' Declarations reflect a farming tradition and attachment to the Klamath Basin that stretches back for generations. It seems highly likely that the individuals represented by the Agricultural Plaintiffs have an interest in and genuine concern for the environmental health of the Refuges and the surrounding area, but that interest is simply not reflected in the Declarations.[3] The Court concludes that the economic harms described in the Declarations do not fall within NEPA's zone of interests and the Agricultural Plaintiffs therefore lack standing under NEPA. Although lack of standing alone would justify the denial of the Agricultural Plaintiffs' Motion for Summary Judgment as to the NEPA claims, the Court concludes that the NEPA claims also fail on their merits, as discussed below.

ii.    **Hard Look**

The Agricultural Plaintiffs argue the Service failed to take a hard look at the consequences of the stipulations contained in the lease land compatibility determinations. Specifically, the Agricultural Plaintiffs contend the Service failed to consider the ability or willingness of the lease land farmers to continue farming under the selected alternative and the environmental consequences that will flow from the fallowing of lease lands if they were abandoned by farmers. The Agricultural Plaintiffs also argue that the Service failed to consider the economic and social effects of fallowing or non-irrigation of the lease lands.

---

[3] Indeed, the Agricultural Plaintiffs' original complaint describes their members' interest in the environmental health of the area at some length. Those concerns were not included in the Declarations in support of summary judgment, however, and the Court cannot rely on the allegations of the complaint to resolve questions of standing on a motion for summary judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The Service previously considered the effects of decreased farming on the Refuges during periods of water scarcity. Following several years of water shortages to Refuge wetlands in the late 1990s "and with the expectation that water shortages could become more common in the future," the Service prepared an EA in 2002 evaluating the agricultural program at Tule Lake Refuge. AR 3270. In the 2002 EA, the Service concluded that curtailing agriculture would be "likely to result in large weed infestations on lease lands," and that weed-infested fields "are seldom used by migratory waterfowl." AR 3271. The Service determined that the conclusions reached in the 2002 EA concerning the curtailment of agriculture continued to be sound and so "this management action was not included in any of the alternatives." *Id.*

In terms of economic impacts, the Service included an entire appendix describing the effects of the various alternatives. AR 4748-85 (Appendix P). For Alternative C, the chosen alternative, the Service concluded that implementation could result in "a decrease in farming production and related local economic impacts due to shifts from grain to irrigated pasture" compared to the "no action" alternative for Lower Klamath Refuge. AR 4768. For Tule Lake Refuge, the Service determined that implementation of Alternative C could result in a "decrease in agricultural production and related local economic activity . . . due to 1,250 acre increase in standing (unharvested) grain," but noted that there was a possibility for greater production of "more valuable organic crops." AR 4770; *see also* AR 4779 (table of crop production acres and sale under all alternatives and changes), AR 4781 (table of economic impacts of crop production under all alternatives and changes).

The Service contends that it was not obliged to consider the effects of farmers abandoning the lease lands or fallowing through non-irrigation because such an outcome was not deemed to be a likely result of the CCP/EIS. "An EIS need not discuss remote and highly

speculative consequences." *Ground Zero for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004) (internal quotation marks and citation omitted). The Service notes that some of the changes have already been implemented in prior lease land contracts and the land has not been left fallow as a result. AR 000002 (list of federal lease land contract changes from 1997 to 2017); AR 42502-08, 42517-19 (2016 lease bid package with sample leases). The Agricultural Plaintiffs also raised the issue of fallowing in a comment and the Service responded that none of the alternatives under consideration would directly result in fallow fields, except potentially through conditions outside the Service's control, like extreme drought. AR 5249. On this record, the Court concludes that the Service reasonably determined that the abandonment and fallowing of the lease lands was a remote and highly speculative possibility and the decision to exclude the effects of abandonment and fallowing from the NEPA analysis was proper.

### b.    The Refuge Act and the Kuchel Act

The Agricultural Plaintiffs contend that the CCP fails to comply with the Refuge and Kuchel Acts because the Service erroneously interpreted the Acts when making compatibility determinations that restrict lease land agriculture and prevent the growing of crops necessary for waterfowl. They support this argument by claiming that the Kuchel Act establishes that lease land agriculture is a purpose of the Lower Klamath and Tule Lake Refuges. For the following reasons, this Court finds that the Service reasonably concluded that (1) lease land farming is subordinate to proper waterfowl management under the plain meaning of the Acts, and (2) that only lease land farming that is consistent with proper waterfowl management may continue.

Judicial deference to an agency's decision extends to an agency's interpretation of a statute it administers. *Mead Corp.*, 533 U.S. at 227-31; *Chevron*, 467 U.S. at 842-45. Under *Chevron*, "if the statute is silent or ambiguous with respect to [a question or term at issue], the

question for the Court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  Therefore, to uphold the Service's interpretations of the Kuchel Act or the Refuge Act, the Court need only find that the Service's interpretation is reasonable. *Chemical Mfrs. Ass'n v. Nat. Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985); *Nat. Res. Def. Council,* 966 F.2d at 1297.

### i.     Interpretation of priorities and the need for Compatibility Determinations

The Kuchel Act requires that the Secretary to administer the refuges "for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith." 16 U.S.C. § 695I.  The Act further requires that the "Secretary shall, consistent with proper waterfowl management, continue the present pattern of leasing . . . ." *Id.* § 695k. In order to give meaning to these express terms, the Service must evaluate what actions are consistent with waterfowl management.  However, the Kuchel Act is silent on a process for determining "consistency."  Therefore, the Service interpreted "consistent therewith" to impose the same legal duty as the compatibility requirement under the Refuge Act. AR 4016; AR 4216.

The Agricultural Plaintiffs cite to the Refuge Recreation Act of 1962, which gives the Secretary discretion to permit public recreation uses within the refuges, to demonstrate that Congress knew how to grant the Secretary the discretion to approve of uses and Congress did not intend that the Service make a "consistency" determination for lease land agriculture.  This argument defies the plain meaning of the Act.  It would be impossible for the Service to, "consistent with proper waterfowl management, continue the present pattern of leasing," without first determining what is consistent with proper waterfowl management.  If Congress wanted lease land agriculture to continue without any oversight from the Service, then Congress could have just allowed homesteading under the Kuchel Act, or at the very least, written the Act

without including the language "consistent with proper waterfowl management." The Service reasonably interpreted the plain language of the Kuchel Act as prioritizing proper waterfowl management and reasonably adopted the compatibility determination process from the Refuge Act to ensure that uses of the refuges are consistent with proper waterfowl management.

### ii.    Interpretation of proper waterfowl management

Unfortunately, the Kuchel Act also does not define "proper waterfowl management." Therefore, the Service was required to craft its own definition of this important phrase. The legislative history of the Kuchel Act reveals that lawmakers believed that agriculture was important for proper waterfowl management and were motivated to maintain agriculture as a means of supporting waterfowl populations. AR 4501; AR 65396-519 (Senate Hearing Transcripts). Nothing in the legislative history or the plain text of the Act demonstrates an intent to preserve agriculture that may not be consistent with proper waterfowl management. The Service considered the legislative history of the Kuchel Act, scientific literature, the goals of the North American Waterfowl Management Plan, and expert opinions from refuge staff, waterfowl mangers, and biologists to define waterfowl management as

> providing habitats sufficient to support waterfowl population objectives throughout the annual cycle while promoting the highest possible natural biological diversity of refuge habitats. A sufficient quantity and diversity of foraging resources should be provided that will meet the energy requirements and nutritional demands of all waterfowl species. Where feasible, natural foods should be given priority over agricultural crops.

AR 4515.

The Service makes clear that not all agricultural practices are consistent with proper waterfowl management:

> The Service believes it was the intent of Congress to maintain the leasing program on the refuges to the extent consistent with proper waterfowl management to support the economies of local rural communities and to provide revenue to

adjacent . . . Counties. Some flexibility in crop types and the desire to maximize
revenues both serve this intent; however, this intent is subject to the primary intent
(major purpose) of proper waterfowl management. Thus, the needs of waterfowl
are first assessed, and then lease contract stipulations regarding acreage, cropping
patterns, and requisite management practices on the lands will need to be developed
consistent with this assessment.

AR 610.

The Service has exercised sound discretion in its interpretation of the phrase "consistent
with proper waterfowl management" in light of the overall purposes of the refuges. The
Agricultural Plaintiffs provide five reasons for why the Service's interpretation of proper
waterfowl management is erroneous, but all of these reasons ultimately fail to demonstrate that
the Service's interpretation is unreasonable.

First, the Agricultural Plaintiffs argue that the Service's interpretation is erroneous
because it allows the Service to "impose restrictive conditions on agricultural practices . . . ."
TID Br. at 21 (#110). This argument fails because under the plain language of the Act, if an
agricultural use is not consistent with proper waterfowl management, then the Act in fact
requires that the Service impose restrictions that ensure proper waterfowl management. As the
"present pattern of leasing" has evolved with the use of technology, the Service must evaluate
the agricultural practices in place to analyze whether they are consistent with proper waterfowl
management. If the Service determines that an agricultural use is not consistent with proper
waterfowl management, the Service must be allowed to restrict the agricultural use.

Second, the Agricultural Plaintiffs argue that because Congress precluded homesteading
but permitted lease land farming then that must mean that all lease land farming is automatically
consistent with waterfowl management. TID Br. at 23. Congress's preclusion of homesteading
may demonstrate that homesteading is inconsistent with proper waterfowl management; it does
not follow that all lease land farming must then be consistent. The Service reasonably concluded

that only lease land farming that is consistent with proper waterfowl management may be continued. The Service further reasonably adopted the compatibility determination process from the Refuge Act to make these consistency determinations.

Third, the Agricultural Plaintiffs argue that because Congress drew a distinction between lease lands and non-lease lands in Section 4 of the Kuchel Act, only non-lease lands should be managed for waterfowl purposes. TID Br. at 23-24. This argument again ignores that plain language of the Act. The Kuchel Act explicitly dedicates "*all* lands owned by the United States" covered under the Act to wildlife conservation. The Service reasonably interpreted the distinction between lease lands and non-lease lands to mean that the Service must give optimum consideration to agricultural uses within lease lands. The Service then reasonably authorized certain types of agricultural use on both Lower Klamath and Tule Lake Refuges.

Fourth, the Agricultural Plaintiffs argue that the Service's interpretation is erroneous because the implementation of Alternative C will impair the United States' performance of the Tulelake Irrigation District Contract ("TID Contract"). The TID Contract limits the area farmed by the Service to 2,500 acres. AR 65539. The Agricultural Plaintiffs claim the Service's decision to increase unharvested grain on the Tule Lake lease lands by 750 acres equates to "commandeering the lands farmed by lessees" and increases the area farmed by the Service beyond 2,500 acres. The Agricultural Plaintiffs also claim that the requirement to flood lease lands post-harvest until February 15 eliminates the ability of lessees to grow winter wheat. A close reading of the CCP reveals that the Agricultural Plaintiffs misstate the Service's restrictions under Alternative C. Of the 750 acres that they claim will go unharvested, really only 25-33% of those 750 acres would be left unharvested. AR 3259; AR 4002. The Service explains that it imposed this restriction in order to compensate for the increase in harvest

efficiency that has resulted in little grain left over for waterfowl to eat. Imposing this requirement is important to ensure that lease land farming remains consistent with proper waterfowl management. Regarding the flooding requirement, the Tule Lake lease stipulation states that the "Service will consider the types of crops before determining which fields will be flooded; for example, alfalfa and *winter wheat* will not be flooded." AR 613 (emphasis added). Further, although the Agricultural Plaintiffs claim that the Service's restrictions on agriculture will reduce lease revenues paid to Tule Lake Irrigation District, this claim is purely speculative as they have presented no evidence that lease land revenues have decreased as a result of the lease stipulations. Moreover, the Service directly analyzed lease land revenues in the CCP. AR 4518; AR 4782-83 (App. P, Table 24).

Finally, the Agricultural Plaintiffs argue that a compatibility determination under the Refuge Act for lease land agriculture is not required because lease land agriculture is a "purpose" of the Tule Lake and Lower Klamath Refuges. TID Br. at 26. As previously explained, the CCP must identify the "purpose" of a refuge and whether a new or existing use is compatible with that purpose. The "purposes" of a refuge are those "derived from the law, proclamation, Executive Order," or other means of establishing or expanding a refuge. 16 U.S.C. § 668ee(10). The Service identified multiple purposes for both the Tule Lake and Lower Klamath Refuges, but did not include farming as a standalone purpose. *See* AR 3141-47 (Lower Klamath's purposes and reasoning behind purpose determinations); AR 3150-54 (Tule Lake's purposes and reasoning behind purpose determinations). The Refuge Act specifically considers farming to be a "refuge management economic use" and calls for compatibility determinations for such a use. 50 C.F.R. § 25.12; AR 64518 (defining refuge management economic activity as one which "results in generation of a commodity which is or can be sold for income or revenue or traded for goods or

services. Examples include: farming, grazing, haying, timber harvesting, and trapping."). The Kuchel Act may put more emphasis on lease land farming as an important program, but the Refuge Act is still controlling over the management of all refuges and the Refuge Act is clear that farming is a use that requires a compatibility determination. Although the Agricultural Plaintiffs may disagree with Service's decision to exclude agriculture as a standalone purpose, the Service's interpretation of the Refuges' purposes is reasonable and entitled to deference under *Chevron*. Therefore, on this record, the Court concludes that the Service did not violate the Refuge Act or the Kuchel Act. The Agricultural Plaintiffs' Motion for Summary Judgment should therefore be DENIED.

## II.    **Audubon Society of Portland's Motion for Summary Judgment**

This section will address the challenge by Audubon Society of Portland, Oregon Wild, and Waterwatch of Oregon (collectively "Audubon") to the CCP/EIS. For the following reasons, this Court recommends that Audubon's Motion (#102) be DENIED. The Service's Cross-Motion (#162) and the Agricultural Plaintiffs' Cross-Motion (#159) should be GRANTED.

### a.    **The Klamath Reclamation Project and KBRA**

The Klamath Reclamation Project is a delivery and drainage project that uses a network of systems to deliver water to the Lower Klamath Refuge for project purposes and removes excess water once the project use is exhausted. AR 3179. The Klamath Reclamation Project was authorized for irrigation, domestic, and power purposes. Use of water for wildlife is not a "purpose" of the project. In 1995, the Pacific Southwest Solicitor issued a Memorandum that clarified how water should be managed in the Klamath Reclamation Project, concluding that the first priority for water was compliance with the Endangered Species Act, followed by protection of tribal trust resources, and then to meet the contractual obligations of the Klamath Reclamation

Project water users, including irrigated lands of the Refuges. Lastly, water would be supplied to meet the junior priority federal reserved water rights of the Refuges. AR 3180. An opinion from the Department of the Interior Solicitor was later issued upholding the opinion of the Regional Solicitor, finding that the Refuges' federal reserved water right was last in priority because it was junior in priority date. The opinion further clarified that certain irrigated lands on the refuge have vested water rights of 1905—rights equal to other project water rights and other project users.

Around the same time that these Solicitor Opinions were issued, the Oregon water rights adjudication process was underway to determine the validity, priority, quantity, and other components of water rights to surface water in the Upper Klamath Basin. In the adjudication, the Service claimed water for "irrigation for or consistent with Refuge purposes" which was specified to include the growth of wetland plants. AR 3187. The Oregon Water Resources Department ("OWRD") released its Final Order of Determination ("FOD") denying the Service's claimed water use, asserting that use of water for wetland plants is not consistent with the term "reclamation." *Id.* Instead, the Service received a 1905 priority date for irrigation uses for the leased and cooperative farmlands on the Lower Klamath and Tule Lake Refuges, a 1925 federal reserved rights priority date for Lower Klamath Refuge, and a 1928 and 1936 priority dates for Tule Lake Refuge. AR 3181. The Service is challenging the OWRD's determination limiting the Service's water right based on the State's interpretation of "reclamation" and "irrigation" in Klamath County Circuit Court. In the interim, the more restrictive language in the FOD is now enforced under state law and the Service cannot change the determined purposes of its claimed water, which is currently agricultural irrigation.

Further, in March 2013, the Service and the National Marine Fisheries Service issued a joint Biological Opinion ("2013 BiOp") on the "Effects of Proposed Klamath Project Operations from May 31, 2013 through March 31, 2023, on Five Federally Listed, Threatened and Endangered Species." AR 3187. The Service claims that the 2013 BioOp has a large influence on how much and when water is available within the Klamath Reclamation Project based on the needs of the five species addressed in the BiOp.

In an attempt to address water issues for the Klamath Basin, the United States joined together with the states of Oregon and California, the Klamath, Karuk, and Yurok Tribes, Klamath Reclamation Project water users, and other Klamath River basin stakeholders to negotiate the Klamath Basin Restoration Agreement ("KBRA") and the Klamath Hydroelectric Settlement Agreement ("KHSA") "to resolve long-standing disputes between them regarding a broad range of natural resource issues." AR 3181. Among other things, the KBRA was intended to "establish reliable water and power supplies which sustain agricultural uses, communities, and national wildlife refuges." *Id.* "In addition to amending the Klamath Reclamation Project purpose to include fish and wildlife, KBRA would have provided specific allocations and delivery obligations for water for the Lower Klamath Refuge which would have substantially increased water availability and reliability." AR 3194.

Final implementation of the KBRA required Congressional approval and, although members of the Oregon and California delegations introduced legislation in two successive sessions, Congress adjourned in 2015 without taking action to implement the KBRA. AR 3182. The KBRA then expired on January 1, 2016. *Id.* At the time the CCP was finalized, the parties to the KBRA continued to work to revive portions of the agreement. AR 3189. "[P]arties to the KBRA continue to work to realize the other bargained-for benefits of the agreements, including

reliable water supply for the refuges." AR 3182. Since the expiration of the KBRA, progress

has been made on some alternative agreements and negotiations are ongoing. AR 3194. The

Service believes that the KBRA "provides a model for parties negotiating alternative agreements

to secure a firm water supply for the refuges in the future." *Id.*

### b.    NEPA

Audubon contends that the Service violated NEPA by (1) failing to provide a true "no

action" alternative and (2) failing to consider viable alternatives for Refuge management.

As noted, an EIS must "[r]igorously explore and objectively evaluate all reasonable

alternatives" to the proposed agency action. 40 C.F.R. § 1502.14(a). However, an EIS "need not

consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel-By-*

*The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "The 'rule of reason'

guides both the choice of alternatives as well as the extent to which the Environmental Impact

Statement must discuss each alternative." *Id.* The reasonable range of alternatives is also guided

by the "purpose and need" of a project. *League of Wilderness Defenders-Blue Mountain*

*Biodiversity Project v. U.S. Forest Serv..* 689 F.3d 1060, 1069 (9th Cir. 2012).

### i.    "No Action" Alternative

As part of the NEPA process, agencies are required to consider an alternative of "no

action," 40 C.F.R. § 1502.14(d), but that alternative "may be thought of in terms of continuing

the present course of action until that action is changed." *Ass'n of Public Agency Customers,*

*Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997) (internal quotation marks

and citation omitted); *see also Nw. Envir. Def. Center v. U.S. Army Corps of Engineers*, 817 F.

Supp.2d 1290, 1312 (D. Or. 2011) (The Ninth Circuit has affirmed NEPA analyses that evaluate

the no-action alternative in the context of the historical uses of the action area.).

In this case, Audubon contends that the Service failed to present a true "no action" alternative because the alternative it presented included the possibility of water supplied under the KBRA, which has lapsed. As such, Audubon argues, the Service did not consider the true status quo situation on the Refuges and therefore lacks an accurate baseline against which to judge other alternatives.

In formulating the "no action" alternative for the CCP/EIS, the Service acknowledged that the availability of an adequate supply of water is a major constraint in providing sufficient waterfowl habitat on the Refuges. AR 3189. The supply of water is also driven in large part by factors beyond the Service's control, such as drought, climate change, and existing water allocation obligations. Because the CCP/EIS is intended to guide refuge management over a fifteen-year period, the Service concluded that it "was important to disclose how the Service would work to meet habitat objectives under a variety of potential future water delivery scenarios." *Id.*

To do this, the Service elected to present two scenarios to "bookend" how much habitat can be developed. *Id.* The first scenario "represents how water supply is currently allocated in the Klamath Reclamation Project, in accordance with the 2013 BiOp."[4] *Id.* The second scenario represents how water would have been allocated under the KBRA, if it had been implemented. *Id.* In doing so, the Service acknowledged that Congress failed to take any action to implement the KBRA, but noted that the parties to the KBRA are working to realize the bargained-for benefits of the agreements. *Id.* As such, the Service "still considers this [water allocation under the KBRA] a reasonable best-case water delivery scenario." *Id.* The two scenarios, the current

---

[4] The Biological Opinions on the Effects of Proposed Klamath Project Operations from May 21, 2013 through March 31, 2023, on Five Federally Listed Threatened Species, issued on May 31, 2013. AR 3193.

system and the best-case KBRA system, "were used to bracket the amount of water the refuges would receive in a wet, average, and dry year." *Id.* Notably, in "all but the wettest years under the 2013 BiOp, water deliveries would fall well short of habitat needs," while "[d]eliveries under KBRA would be greater and more consistent than under the 2013 BiOp, especially during dry years." AR 3194-95. However, "[n]one of the alternatives rely upon the implementation of the KBRA," but only use that data to "disclose how the Service would approach habitat management based on a range of available water supply." AR 4979.

The Service did not, as Audubon suggests, conceal the severity of the water shortage by including the KBRA scenario as part of its "no action" alternative. The CCP/EIS is meant to guide Refuge management for a fifteen-year period and the highly variable supply of water is driven by factors that are largely beyond the Service's control. By including the KBRA scenario, the Service simply disclosed how it would manage wildlife and habitat under best-case conditions and it directly contrasted that "upper bookend" with the current water allocations system from the 2013 BiOp. AR 3202. On this record, the Court cannot conclude that the Service failed to present a true "no action" alternative.

### ii.    Other Alternatives

Audubon also contends that the Service failed to adequately consider other alternatives for securing additional water for the Refuges. Agencies are required to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). An agency can explain why it eliminated suggested alternatives from detailed consideration in response to public comments. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 870-72 (9th Cir. 2004).

Among the alternatives suggested by Audubon was the acquisition or transfer of existing

water rights for habitat use on the Lower Klamath Refuge.  This alternative was suggested during

the comment period and the Service provided a lengthy and detailed response explaining why the

option was not included in the alternative analysis.  AR 4966-69.  The Service explained that the

water rights in question were the subject of an ongoing state adjudication.  *Id.*  "Resolution of the

water rights issues" would "require the issuance of the Klamath Basin adjudication decree under

Oregon water law."  AR 4968.  "Until the Klamath Basin adjudication is finalized, the

opportunities for acquiring water rights are difficult to evaluate since many rights are not final

yet."  *Id.*  "The timeline to the adjudication's final decree is unknown, but is not expected to

occur within the 15 years life cycle of the CCP/EIS.  Therefore, the Service considers the options

above infeasible for consideration at this time."  *Id.*; AR 53 (The Service estimates that the

judicial phase of the adjudication will take a minimum of 10-12 years to complete, followed by a

years-long process of applying to the Oregon Water Resources Department to permanently

transfer the water rights); AR 3270-71 ("Given that the first phase of the Klamath Adjudication

took 38 years to complete, it is reasonable to assume that the judicial phase of the adjudication

will not be completed during the 15-year life of this CCP.").  On this record, the Court concludes

that the Service provided an adequate justification for not including the acquisition or transfer of

water rights in the alternatives analysis.

Another alternative advanced by Audubon was "the temporary transfer of [the Service's]

1905 irrigation rights to instream use for the benefit of fish and wildlife on the Refuges."  AR 54.

An "instream water right" is "a water right held in trust by the Water Resources Department for

the benefit of the people of the State of Oregon to maintain water in-stream for public use."

ORS 537.332(3).  Such public uses include "[c]onservation, maintenance and enhancement of

aquatic and fish life, wildlife, fish and wildlife habitat and any other ecological values." ORS 537.332(5)(b). "In-stream" means "within the natural stream channel or lake bed or place where water naturally flows and occurs." ORS 537.332(1). However, "[a]n instream water right does not require a diversion or any other means of physical control over the water." ORS 537.332(3). The Service rejected the suggested alternative because "[t]he delivery of water to the Lower Klamath Refuge is not an instream water use." AR 55. Audubon disputes the Service's conclusion concerning the definition of "instream water use," but the Service met its obligation under NEPA to "briefly discuss" the reason for the rejecting the proposed alternative.

Finally, Audubon argues that the Service failed to consider a reduction in lease lands on the Refuges as an option for achieving Refuge purposes and proper waterfowl management. The Service did, however, consider both the elimination of lease land farming and the curtailment of agriculture. AR 3270-71. With respect to the elimination of lease land farming, the Service determined that "[f]or migrating and wintering waterfowl, food is believed to be the most limiting resource. As a result, conservation planning for waterfowl outside of the breeding season is largely focused on providing sufficient foraging habitat." AR 3270. Under the current system of water rights, "agriculture on the refuge is assured of receiving water each year while wetland areas are not." *Id.* "Without some degree of water supply reliability, which is provided through irrigation water, sufficient food resources for waterfowl could not be produced." *Id.* With respect to the curtailment of agriculture, the Service determined that "any water savings from a reduced irrigation program on the refuge would simply make more water available to higher priority Project water users rather than to refuge wetlands." *Id.* "In addition, curtailing agriculture is also likely to result in large weed infestations on lease lands. Weed-infested fields are seldom used by fall migratory waterfowl." AR 3271. On this record, the Court concludes

that the Service provided an adequate explanation for its decision to exclude the elimination or curtailment of agriculture on the Refuges from detailed consideration under NEPA.

### c.    The Refuge Act

Audubon argues that the Service violated the Refuge Act by (1) failing to satisfy the Secretary's duty to ensure adequate water resources necessary to fulfill refuge purposes, and (2) delegating authority to the Bureau of Reclamation to administer the lease lands program.

### i.    Water Resources for Lower Klamath

The Refuge Act states that the Secretary "shall," among other things, "assist in the maintenance of adequate water quantity . . . to fulfill the mission of the System and the purposes of each refuge," and "acquire, under State law, water rights that are needed for refuge purposes." 16 U.S.C. § 668dd(a)(4)(F), (G). The issue of water availability on the Klamath Basin is complicated and involves multiple stakeholders. The Service acknowledges that it may not be able to provide enough water necessary to achieve refuge purposes in years of drought, as there are limitations on the Service's ability to acquire water rights or physically obtain water.

The Service does not have the authority to change the Refuges' junior priority water rights within the Klamath Basin water rights hierarchy. Moreover, although the Oregon water rights adjudication granted certain water rights for the Refuges and established the relative priority of all water rights within the Klamath Basin, the priority of Klamath Reclamation Project water users relative to each other was not addressed. The issue of within-Project priority must be determined by the Secretary of Interior and is currently controlled by contracts between the Klamath Reclamation Project water users and the United States. The Service and the Bureau of Reclamation continue to work towards a common understanding of the within-Project priority

for lands on Lower Klamath Refuge that is consistent with both Reclamation's water contracts and the 2013 BioOp.

The Service considered the history and the complexity of water rights for the Klamath Basin when it chose the selected management alternative for each Refuge. The Service set forth in the CCP that its "objective" for water deliveries on the Lower Klamath Refuge is to "seek to secure and efficiently distribute water of sufficient quantity and quality to achieve habitat and population objectives." AR 3814. This objective is consistent with the Refuge Act's directive to assist in the maintenance of adequate water quantity and quality to fulfill the mission of the Refuge System. The Service will follow nine different strategies set forth in the selected alternative for Lower Klamath Refuge to meet the Service's objective. For example, the Service will "[p]ursue exceptions to the [OWRD's FOD] that would allow the use of irrigation water in seasonal wetlands, follow the flood fallow agricultural practice, and change the period of use for irrigation water to year round . . . ." AR 3225. The Service will also wait to see if another version of the KBRA will pass through Congress, and if it does not, the Service will "pursue changes in the type, place of use, and period of use for Lower Klamath and Tule Lake water rights to ensure sufficient water is available for refuge wetlands." *Id.* The record also shows that the Service considered Audubon's proposals and explained why it decided the proposals were not feasible. AR 4966-69. The Service's selected management alternative with its nine action plan items is rationally based on the options available to the Service. These action items to be undertaken by the Service under the CCP illustrate that the Service has complied with the Refuge Act's instruction to assist in the maintenance of adequate water quantity and quality for Lower Klamath Refuge and acquire water rights that are needed for refuge purposes.

ii.      **Bureau of Reclamation**

The Bureau of Reclamation ("Reclamation") administers the lease lands program on the

Lower Klamath and Tule Lake Refuges pursuant to a Cooperative Agreement with the Service.

AR 4840-63 (Cooperative Agreement).  The Agreement authorizes Reclamation to prepare,

solicit, review, and approve lease contracts for the lease lands program.  AR 4846-47.

Reclamation is also responsible for compliance and enforcement of lease contracts, lease

extensions and terminations, and collection and deposit of rents.  AR 462.  The CCP states "[t]he

Service would continue to delegate management of the lease lands program to Reclamation,"

(AR 3247) and "[a]lthough the lease lands are under administrative jurisdiction of the Refuge

Complex, Reclamation administers the agricultural leasing program via a Cooperative

Agreement, including pesticide use, for the Refuge Complex[.]"

Audubon argues that the CCP violates the Refuge Act by authorizing Reclamation to

continue its involvement in administering the lease lands agricultural programs because the Act

requires that the Refuge System be administered by only the Secretary through the Service.  In

support of this argument, Audubon relies on *Trustees for Alaska v. Watt*, 524 F. Supp. 1303 (D.

Alaska 1981), a case in which the Secretary had transferred to the U.S. Geological Survey

("USGS") lead responsibility for (1) establishing initial guidelines by regulation for conducting

oil and gas exploratory activities on the Arctic National Wildlife Refuge; (2) approving

exploration plans on the refuge; and (3) reporting on the exploration results and the effect further

exploration and development would have on wildlife.  *Id.* at 1305-07.  In that case, the court held

that the Secretary had exceeded his statutory authority by delegating "management" activities to

the USGS because the Service was required to control and direct the management of the refuge.

*Id.* at 1309-10.

In this case, unlike in *Trustees for Alaska*, the Service retains ultimate control over all activities on the Refuges, including how lease land farming is managed, and any stipulations necessary to ensure that lease land farming is consistent with refuge purposes. The Service's Compatibility Determinations for lease land farming require Reclamation to apply for a Special Use Permit annually in order to continue operating the lease land farming program and the permit must include the stipulations and prescribed habitat mix set by the Service for each refuge. AR 416 (Lower Klamath); AR 616 (Tule Lake). Therefore, the CCP does not violate the Refuge Act by allowing Reclamation to continue to administer the day-to-day operations of the lease land farming program.

### d.    The Kuchel Act

Audubon argues that the Service failed to define what "necessary existing habitat for migratory waterfowl" meant at the time of the Kuchel Act's enactment, and subsequently failed to preserve habitat for migratory waterfowl that existed at the passage of the Act. The Kuchel Act does not define "proper waterfowl management," so the Service considered several factors and interpreted the phrase to mean

> providing habitats sufficient to support waterfowl population objectives throughout the annual cycle while promoting the highest possible natural biological diversity of refuge habitats. A sufficient quantity and diversity of foraging resources should be provided that will meet the energy requirements and nutritional demands of all waterfowl species. Where feasible, natural foods should be given priority over agricultural crops.

AR 4515.

The Service further described its interpretation of the Kuchel Act relative to the Lower Klamath and Tule Lake Refuges, including the meaning of the phrase "preserve intact necessary existing habitat." AR 4501. The Service expanded on its interpretation, stating that

> Section 1 of the Kuchel Act [which includes the term necessary existing habitat] makes clear that Congress' intent was to preserve existing waterfowl habitats on the Klamath Basin refuges and prevent waterfowl depredations on agricultural crops in the Pacific Flyway. This would occur through proper management of these refuges to provide adequate habitat to hold birds until crops had been harvested in the Central Valley. Thus, to comply with the Act, it is imperative that the Service restores lost waterfowl values and Tule Lake and Lower Klamath Refuges by developing strategies that improve and maintain those lands for waterfowl under the definition of 'proper waterfowl management,' while also continuing the Refuge agricultural leasing program to the extent consistent with proper waterfowl management of those lands.

AR 4541.

This passage reveals that the Service included in the CCP a need to restore lost waterfowl values by developing strategies that improve and maintain the refuges for waterfowl. The Service's definition of proper waterfowl management references "population objectives," which the Service explained became the thresholds toward which direct habitat management is targeted. The Service uses inventory and monitoring of populations to evaluate actual waterfowl populations and habitats as part of an adaptive management process. This process assumes that food availability is a key factor limiting waterfowl populations. AR 4536. Because the Kuchel Act is silent or ambiguous with respect to the meaning of a number of terms and phrases, including "necessary existing habitat" and "consistent with proper waterfowl management," the Service's interpretation of the Kuchel Act is entitled to deference. *See Chevron*, 467 U.S. at 843-44 (where Congress has left undefined terms in a statute for an agency to interpret, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."). Although Audubon raises valid concerns over decreasing waterfowl populations, the Court finds that the CCP adequately articulates the Service's interpretation of the need to maintain existing habitats sufficient to support population objectives.

Similarly, Audubon argues that because water availability is contributing to the decrease in waterfowl populations, the Service is required to prioritize the allocation of water to wetland habitat over the allocation of water to agricultural uses. As discussed above in response to the Agricultural Plaintiffs' arguments, the Service has discretion to alter or even eliminate farming on the refuges if the Service reasonably determines that farming is not consistent with proper waterfowl management. On the other hand, if the Service can reasonably determine that allowing the present pattern of leasing is still consistent with proper waterfowl management, then the Service is not required to reduce the present pattern of leasing.

On this record, even though the Service acknowledged that limited water resources may present a challenge in maintaining waterfowl populations, the Service reasonably determined that the present pattern of leasing is still consistent with waterfowl management because lease land agriculture provides food for waterfowl and also helps ensure that water will be delivered to the refuge. As discussed above, there are many factors outside the Service's control that dictates how and when water is delivered to the refuges. The record shows that the Service considered whether reducing agricultural leasing would benefit waterfowl during periods of water shortage and found that water diverted from lease lands would go to higher priority users under the Klamath Reclamation Project rather than to the Service for refuge wildlife management. AR 64032; AR 4966-69 (describing the Service's ability to use irrigation water for management of wetlands). The Service concluded that the reliability of water for leased land agriculture assists in sufficient production of food resources for waterfowl. AR 3233. Moreover, the Service considered Audubon's criticism of allowing alfalfa farming instead of prioritizing walking wetlands and explained that Refuge alfalfa and hay fields attract large populations of migrant waterfowl and are attractive crops to ground nesting birds. AR 3844-45. The Service concluded

that allowing alfalfa and hay farming on the refuge also reduced crop depredation on private farmland consistent with Section 1 of the Kuchel Act. The record shows that the Service also considered buying out agricultural leases to eliminate lease land farming and restore the lease land area to native habitat. AR 3233. The Service determined that this was not a reasonable option because the food provided to waterfowl from agriculture on Lower Klamath and Tule Lake Refuges contributes to proper waterfowl management. AR 3270-71 (finding that reducing agriculture in years of drought would end up reducing food for fall waterfowl, not increasing it). Although Audubon may disagree with these decisions, based on the complex nature of water rights in the Klamath Basin, the Service's decisions and explanations in the CCP are not arbitrary or contrary to law.

  **e.**   **The Clean Water Act**

  Finally, Audubon argues that the Service violated Section 313 of the CWA because the CCP does not ensure compliance with state water quality standards. The CWA generally prohibits the "discharge of any pollutant" into navigable waters from any point source. 33 U.S.C. §§ 1311(a), 1362(12). The pollutant at issue here is runoff from agriculture on the Lower Klamath and Tule Lake Refuges. Runoff from agriculture is considered a "nonpoint source" in the Ninth Circuit. *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1096 (9th Cir. 1998). The State of California regulates nonpoint source discharges from agriculture on the Lower Klamath and Tule Lake Refuges. Section 313 of the CWA requires each federal agency that has jurisdiction over any property or is "engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall be subject to, and comply with, all Federal, State, interstate, and local requirements . . . respecting the control and abatement of water pollution . . . ." 33 U.S.C. § 1323(a). Put simply, the CWA requires the Service to comply with the State of

California's water pollution laws with respect to runoff from agriculture on the leased farmlands on Lower Klamath and Tule Lake Refuges.

Regulation of nonpoint source discharge in California falls under California's Porter-Cologne Act, which is overseen by the State Water Resources Control Board ("State Board") and administered by nine regional water quality control boards ("Regional Board(s)"). *See* Cal. Water Code §§ 13140, 13200. Regional Boards adopt "water quality control plans" (also known as "basin plans") for bodies of water or regions to establish water quality objectives that serve as "water quality standards" for purposes of the CWA. Cal. Water Code §§ 13050(j), (h), 13240; *see also* 40 C.F.R. § 131.3(b), (i). Basin Plans include waste discharger requirements ("WDRs"), which authorize and regulate discharges to waters and implement water quality standards or objectives established in the basin plan. Cal. Water Code § 13263(a).

At issue in Audubon's claim is the "Lower Lost River," a hydrologic area within the Klamath River watershed and includes lands within the Tule Lake and Lower Klamath Refuges. AR 33654; AR 33674-75. California categorized Lower Lost River as "impaired," meaning it fails to meet or exceed established numeric water quality criteria. AR 33660-61. Under the CWA, states or the EPA must develop total maximum daily loads ("TMDLs") for impaired waters to identify the maximum amount of pollution that can be delivered to the body of water such that the water quality standards for that body of water can still be met. 33 U.S.C. § 1313(d)(1)(C). Because the Lower Lost River was listed as impaired, the EPA developed the Lower Lost River TMDL in 2008. In the TMDL document, the EPA recommended that the Service "[i]dentify actions to improve water quality as part of the development of the Refuge [CCP]." AR 33747. The EPA acknowledged that its implementation recommendations are strictly advisory and that the North Coast Regional Board would be responsible for incorporating

a state implementation plan into the "North Coast Basin Plan." AR 33679. The North Coast

Regional Board then adopted the Lower Lost River TMDL into its North Coast Basin Plan and

prepared an Implementation Plan dated March 2010.

     The North Coast Basin Plan includes an implementation action that requires the Service

to work with the Bureau of Reclamation, TID, and the Regional Water Board to develop and

implement a Management Agency Agreement that will address the water quality impacts of the

Bureau of Reclamation's Klamath Project. AR 32295; 88549. The North Coast Basin Plan gave

these parties six months to complete the Management Agency Agreement, but also provided that

action items will be evaluated in annual and five-year reassessments by the North Coast Regional

Board. AR 32295; 88549-55. The Management Agency Agreement has yet to be completed.

However, the Service argues that it is not in violation of the Lost River TMDL because the North

Coast Regional Board has also not yet developed WDRs concerning nonpoint discharges for the

Lost River TMDL. AR 4999. It appears that because WDRs authorize and regulate discharges

and implement water quality standards, the WDRs need to be developed before the parties will

agree on the Management Agency Agreement.

     Although the amount of time passed while negotiating the Management Agency

Agreement is not ideal, the Court will not hijack those processes when the responsible

governmental entities—namely the State and Regional Boards—have yet to adopt WDRs to

implement the TMDL. Moreover, the North Coast Regional Water Board is responsible for

taking enforcement actions for violations of the implementation plan under state law. AR 88554.

On this record, the Board has not taken any enforcement actions and the Court is not in a

position to force them to do so. *See* Cal. Water Code §§ 13220, 13330 (parties seeking

enforcement of a water quality control plan established under state law must first file a petition

under the Porter-Cologne Act's administrative appeal process and exhaust its administrative

remedies). The Service asserts that it is currently working with the Bureau of Reclamation, TID,

and the North Coast Regional Board to create the Management Agency Agreement, as they are

required to do under state law. Therefore, because the Service has complied with California's

regulatory scheme for water pollution from nonpoint source discharges, the CCP is not in

violation of CWA § 313.

### III.   WWP Motion for Summary Judgment

This section will address the Western Watershed Project ("WWP")'s challenge to the

CCP's grazing determination. For the following reasons, WWP's Motion for Summary

Judgment (#98) should be DENIED. The Service's Cross-Motion for Summary Judgment

(#146) should be GRANTED. The Agricultural Plaintiffs' Cross-Motion (#148) should be

GRANTED in part on the issues of whether there were violations of NEPA and the Kuchel Act,

but DENIED insofar as the Agricultural Plaintiffs contest the necessity of a compatibility

determination.

#### a.    Clear Lake National Wildlife Refuge

WWP's challenge to the CCP is specific to the Clear Lake National Wildlife Refuge and

the species that rely on its critical habitat. The Clear Lake Refuge was established by executive

order in 1911 as a preserve and breeding ground for native birds. Clear Lake Refuge covers a

total of 33,401 acres in Modoc County, California. AR 3388. The refuge is bounded by the

Modoc National Forest and the Lava Beds National Monument. *Id.* Of the 33,401 refuge acres,

roughly 20,000 acres are open waters of the Clear Lake Reservoir. The Clear Lake Dam and

Reservoir are governed by the United States Bureau of Reclamation as part of that agency's

Klamath Reclamation Project. AR 3390. The Bureau of Reclamation regulates water levels to meet irrigation purposes. *Id.*

Clear Lake Refuge supports both Lost River and shortnose suckers. AR 3396-97. Both species spawn in Willow Creek, a tributary of Clear Lake. *Id.* Data from 2004 and 2006 showed that suckers were relatively abundant in Clear Lake, although there was a lower frequency of large individuals compared to data from the 1990s, which suggests relatively good recruitment, but low adult survivorship. *Id.* It is estimated that the construction of the Clear Lake Dam resulted in larger habitat and better access to spawning tributaries, which caused sucker populations to increase substantially. AR 3396. The Bureau of Reclamation typically releases water from Clear Lake between April and October for agricultural irrigation. *Id.* Water is not typically released between November and March, except for flood control purposes. *Id.* Fish that pass through the Clear Lake Dam are not able to return to Clear Lake, although a mesh barrier was installed in 1993 to restrict juvenile and adult suckers from leaving the lake during the irrigation season. *Id.*

Clear Lake also provides critical habitat for the greater sage grouse. The greater sage grouse was once widespread, but its population numbers and range have declined sharply in recent decades. AR 3397. The "U" is a 5,000-acre peninsula in the Clear Lake Refuge that extends into the lake from the south and is used by the sage grouse year-round. *Id.* The "U" is home to the last active lek (sage grouse strutting ground/mating area) in the Modoc Plateau. *Id.* Over the last 25 years, the sage grouse's use of the 18 leks adjacent to the Clear Lake Refuge has dropped to zero, while attendance on the "U" lek has declined by 80% since 1992. *Id.* From late summer to fall, the lakeshore provides excellent forage for sage grouse chicks as the lake recedes

and forbs[5] emerge on the newly exposed soil. AR 3397. Juniper encroachment, which has

occurred since settlement of the Refuge area, has been identified as one of the greatest risks to

the continued existence of the sage grouse in the area because juniper displaces sagebrush, which

is vital as cover and food for the grouse. AR 3398. "From an aerial view, it becomes readily

apparent that Clear Lake Refuge is like an island of sagebrush surrounded by a sea of junipers."

*Id.*

### b. Cattle Grazing on Clear Lake Refuge

Cattle grazing has taken place in the Clear Lake area since the late 1800s, long before the

Refuge was established. AR 51880. "Cattle use of the refuge was largely unregulated prior to

the mid-1990s because of inadequate fencing between the refuge and Forest Service grazing

allotments." AR 51878. In recent years, approximately 5,500 acres (600 animal unit months

("AMU"s) around the "U" have been grazed between mid-August and mid-November. AR

3554. The "U" itself does not have any cross fencing, watering sites, or other range

improvement structures. AR 57973. The cattle are confined to the "U" by a fence running

across the "top" of the "U" and a southeastern boundary fence, as well as by the lake shore itself.

AR 57977. The cattle get water from Clear Lake and so "tend to stay fairly close to the waterline

during their time on the U." *Id.* The western boundary of Clear Lake Refuge is not fenced. AR

3554. Modoc County, California is an open rage, encumbering the landowner to keep undesired

livestock off their property. *Id.*

With respect to sage grouse and other birds, the Service noted that grazing livestock can

prevent nesting attempts; cause nest abandonment; trample nests, eggs, and young; and otherwise

disturb ground-nesting birds, particularly when the livestock are released into or removed from

---

[5] Generally, forbs are considered broad-leaf, flowering plants that are not grass-like and do not become woody.

the grazing area. AR 506. Regulation of livestock numbers and monitoring are necessary to control these negative effects. *Id.* With respect to the Clear Lake sucker fish population, the Service observed that "[g]razing can adversely affect aquatic environments," but "the Service has no empirical data that shows current grazing practices adversely affect the primary constituent elements (PCEs) of critical habitat for suckers in Clear Lake." AR 508.

A 1980 interagency agreement with the Modoc National Forest has allowed cattle grazed under U.S. Forest Service permits to access water on approximately 800 acres within the Clear Lake Refuge boundary. AR 3554. Approximately 300 head of cattle are permitted to graze under the interagency agreement no earlier than July 15 and only for 23 days. *Id.* The claimed benefits of the interagency grazing agreement are reduced fuel and fire threats on the refuge and enhanced Canada goose grazing. *Id.*

### c. The Clear Lake Refuge Compatibility Determination

As part of the CCP/EIS process, the Service issued Compatibility Determinations ("CD(s)") for Clear Lake Refuge. Subject to limited exceptions, the Service may not "initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge unless the Secretary has determined that the use is a compatible use and that the use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i). A "compatible use" is any use of a refuge that, based on "sound professional judgment, will not materially interfere with or detract from the fulfillment of the mission of the System or the purpose of the refuge." *Id.* § 668ee(1); 50 C.F.R. § 25.12. Sound professional judgment means "a finding, determination, or decision that is consistent with the principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge] Act and other applicable laws." 16 U.S.C. § 668ee(3). In making a compatibility determination, the Service

must consider the anticipated impacts of the use on the refuge's purpose and on the mission of the National Wildlife Refuge System. *Id.* § 26.41(a)(8). In order for the CD to be valid, it must "[d]escribe the specific areas of the refuge that will be used: habitat types and acres involved [and] key fish, wildlife, and plants that occur in or use that habitat." 50 C.F.R. § 2.12(A)(6)(b); AR 64530. The purpose of Clear Lake Refuge is to act as a preserve and breeding ground for the conservation and protection of native birds and migratory waterfowl, while continuing agricultural use consistent with that purpose. AR 502.

The CD for Clear Lake Refuge contemplates limited grazing. AR 502-14. In general, the Service anticipates that the "traditional grazing program would continue in a similar manner to how it has been conducted in the past." AR. 503-04. In addition to the traditional grazing program, the Service proposed a wildfire restoration grazing program during the spring months. The Service plans to establish two 1,500-acre pastures on the east side of the "U," in an area damaged by wildfire in 2001. AR 503. These pastures would be grazed by 300-500 cattle from March 1 to mid-April, with monitoring and experimental plots to "fine tune" the grazing strategy with respect to the number of cattle, duration and timing." AR 503. "This grazing program would be phased out if it reduced the presence of exotic annual grasses to a great enough extent that native perennial grasses, forbs, and shrubs were successfully reestablished." *Id.* No sage grouse hens are known to nest in the areas under consideration for early spring wildfire restoration grazing due to a lack of sage brush cover. AR 506. By the time dormant season grazing would begin on the rest of the "U," potential bird nesting would be over. *Id.*

The spring wildfire restoration grazing would be used to target the presence and spread of exotic annual grasses while minimally damaging native, perennial bunchgrasses; and dormant-season grazing would reduce the height, density, and thatch associated with native and exotic

grasses, but with minimal effect on their long-term health and survival. AR 511. Fall grazing would create areas of succulent, short grass preferred by geese. *Id.* The prescribed grazing strategies would give native perennial grasses, forbs, and shrubs a competitive advantage; help restore native habitats; and reduce the abundance of fire fuels and the associated threat of wildfire. *Id.* The Service also determined that spring grazing would support the recovery of sagebrush communities and species such as the sage grouse. *Id.* The Service concluded that grazing activities would create some intermittent, short-term, and localized wildlife disturbance and that nutrients from livestock manure could potentially impact ground and surface waters. AR 511. "However, the larger and longer-term habitat benefits of a properly conducted program would far outweigh such negative effects." *Id.*

**d. NEPA**

WWP contends that the Service violated NEPA by (1) failing to consider alternatives that included the reduction or elimination of grazing on Clear Lake Refuge and (2) failing to adequately consider the impacts of grazing on the Clear Lake sage grouse and sucker fish populations.

**i.    Consideration of Alternatives**

As noted, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed agency action. 40 C.F.R. § 1502.14(a). However, an EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel-By-The-Sea*, 123 F.3d at 1155. "The 'rule of reason' guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." *Id.* The reasonable range of alternatives is also guided by the "purpose and need" of a project. *League of Wilderness Defenders-Blue Mountain Biodiversity Project*, 689 F.3d at 1069.

The Service considered two alternatives for Clear Lake Refuge: a "no action" alternative, which would continue the Refuge's current management program (Alternative A); and a preferred alternative that would increase grazing as part of a wildfire restoration program (Alternative B). AR 3234-45. WWP makes three arguments for why the Service should have considered alternatives that included a reduction or elimination of grazing on the Refuge.

First, WWP contends that grazing conflicts with the Refuge's purpose as a preserve to native birds and a landscape dedicated to wildlife. Therefore, WWP argues, "a reasonable range of alternatives would have included analysis of whether a shorter grazing season, smaller grazed area, or fewer cows—or removal of livestock grazing entirely—would better meet the Clear Lake Refuge purpose, including providing habitat for native species like sage grouse and ESA-listed suckers." WWP Mot. Summ. J. at 17 (#98).

In considering alternatives, an agency need not consider "alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of an area." *Headwaters, Inc. v. Bureau of Land Mgmnt.*, 914 F.2d 1174, 1180 (9th Cir. 1990). In 1996, the Service prepared a CD for Clear Lake Refuge that assessed a "no grazing" alternative and found:

> No grazing would eliminate the close cropped vegetation required by Canada geese and other migratory waterfowl and shorebirds as foraging areas (Eberhart, Anthony, and Rickard 1989). The loss of lightly grazed exposed waterline areas would reduce the amount of preferred forage for pronghorns and sage grouse which are refuge emphasis species (Evans 1985; Klebenow 1980, 1981; Salwasser and Shimamoto 1981).

AR 64793-94.[6]

---

[6] "Compatibility determinations in existence on October 9, 1997, shall remain in effect until and unless modified." 16 U.S.C. § 668dd(d)(3)(A)(iv). As the 1996 CD for the Clear Lake NWR predates this cutoff, it remained in effect until the present CCP was issued.

The 1996 Clear Lake Refuge CD compared the "no grazing" alternative to a managed grazing program and found that managed grazing offered the best option for refuge emphasis species (pronghorns and sage grouse) and the best management options.  AR 64796.

When an alternative is eliminated from detailed study, the agency must briefly discuss the reasons for elimination.  40 C.F.R. § 1502.14(a).  The agency is not required to include this brief discussion in the alternatives analysis itself and may instead provide the reasons for rejecting an alternative in response to comments.  *Westlands Water Dist.*, 376 F.3d at 870.  In this case, the Service responded to comments arguing for the reduction or elimination of grazing on the Clear Lake Refuge.  AR 4918-19.  In its response, the Service noted that the grazing permitted at Clear Lake Refuge is highly managed and controlled and that such seasonal management helps control the spread of non-native grasses.  AR 4918.  The Service also noted that

> Consistent with the Kuchel Act, the Refuge incorporates agricultural practices like grazing to help achieve its wildlife and habitat objectives.   The use of grazing to help meet vegetation objectives like consuming pest and invasive plants, opening areas that would otherwise be chocked with vegetation and sub-optimal for use by waterfowl, and creating short-grass pasture for migratory birds are examples of this approach. . . . [T]he Service believes expanding this agricultural practice to further achieve wildlife objectives is substantially more likely to improve habitat rather than degrade it; reducing grazing would have the opposite overall effect.

AR 4918-19.

On this record, the Court concludes that the Service reasonably found that a reduced or no-grazing alternative was ineffective or inconsistent with the basic policy goals of the Clear Lake Refuge.  The Court further concludes that this determination was adequately supported by the record.  The Service documented that the expansion of native juniper beyond its historic range was a cause for the abandonment of sage grouse leks as juniper out-competes desirable vegetation like sagebrush.  AR 3239.  The Service identified three possible methods for controlling the spread of juniper: (1) cattle grazing; (2) mechanical methods, like chainsaws and

pruning; and (3) chemical methods, like herbicides. *Id.* Chemical methods were not eliminated from consideration, but the Service noted that "herbicides were unlikely to provide long-term suppression of annual grasses." AR 3566. In response to comments, the Service noted that mowing is impractical on Clear Lake Refuge because of the uneven terrain and the risk of fire, AR 4917, while managed grazing offered the additional benefit of fire fuel reduction. AR 3239. Fire in sagebrush ecosystems is one of the primary risks to the sage grouse, "especially as part of the positive feedback loop between exotic invasive annual grasses and fire frequency." AR 55184.

Second, WWP argues that the Service should have considered the possibility of reducing grazing by cancelling the long-standing interagency agreement allowing cattle to cross from the neighboring Modoc National Forest to graze on portions of the Clear Lake Refuge. The Service rejected the notion of fencing the boundary between the Clear Lake Refuge and the Modoc National Forest, noting that such a fence was "not biologically desirable," due the risk of sage grouse collisions with a fence and the restrictions it would impose on the movement of deer and pronghorn. AR 503. The Service also noted the benefits to the Refuge from grazing under the interagency agreement, particularly with respect to fuel reduction and fire threat. *Id.* On this record, the Court concludes that Service reasonably assessed the value of the existing interagency agreement and rejected the possibility of fencing the boundary as inconsistent with the Clear Lake Refuge's goals.

Third, WWP argues that the Service erred by failing to consider a "no action" that eliminated grazing entirely. Agencies are required to consider an alternative of "no action," 40 C.F.R. § 1502.14(d), but that alternative "may be thought of in terms of continuing the present course of action until that action is changed." *Ass'n of Public Agency Customers, Inc.* 126 F.3d

at 1188 (internal quotation marks and citation omitted).  Managed grazing is indisputably a

historical use of the Clear Lake Refuge and so the CD appropriately considered the continuation

of that use in formulating the "no action" alternative.

   **ii.**  **Sage Grouse and Suckers**

   WWP argues that the Service further violated NEPA by (1) failing to take the requisite

"hard look" at the negative effects of grazing on both the sage grouse and the sucker species; and

(2) failing to consider the cumulative effects of grazing on the sage grouse and suckers.

   **a.  Hard Look**

   As previously noted, NEPA imposes procedural requirements "designed to force agencies

to take a 'hard look' at the environmental consequences" of the proposed action.  *Lands Council*,

395 F.3d at 102.

   With respect to the sage grouse, WWP argues that the Service failed to consider the

harmful effects of the proposed spring grazing on the "U."  WWP contends that this grazing is

proposed to be intensive and to take place during the nesting season of the sage grouse, with

attendant risk of disruption.  As noted in the previous section, the grazing under consideration is

a limited and monitored program of wildfire restoration grazing.  The Service has tracked radio-

marked sage grouse since 2005 and found that no hens are known to nest in the proposed grazing

area due to the lack of sage brush cover.  AR 3575.

   The Service also documented consideration of the negative effects of grazing on sage

grouse, generally.  AR 3566 ("If not properly managed, grazing can cause an excessive reduction

in vegetation height,"); 3569-71 (discussing the negative effects of grazing generally and on the

sage grouse specifically and stressing the importance of management).  The Service also

responded to comments on the negative effects of grazing, including comments from WWP.  AR

4908; 5139-40; 5147-48; 5216-17; 5231. "Although an agency's actions under NEPA are subject to careful judicial scrutiny, courts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency." *Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmnt.*, 387 F.3d 989, 993 (9th Cir. 2004). On this record, and considering the deference the Service is entitled to, the Court concludes that the Service took the requisite hard look at the effects of grazing on the sage grouse before determining that strictly managed grazing should be permitted on the Clear Lake Refuge.

WWP also argues that the Service ignored the impact of grazing on the suckers and their habitat. The Service acknowledged that grazing can "adversely affect aquatic environments," but the Service had "no empirical data that shows that current grazing practices adversely affect the primary constituent elements (PCEs) of critical habitat for suckers in Clear Lake." AR 508; 5154. For example, "excessive grazing" can, "if livestock were allowed access to surface waters, create turbidity." AR 3558. However, "[b]ecause grazing to help control invasive species at the refuge is localized and seasonal, these impacts are likely to be only occasional, of short duration and no more than minor." *Id.*

WWP argues that the Service was obliged to conduct its own research and create data to determine if suckers are adversely affected by grazing on Clear Lake Refuge. However, "an agency is under no obligation to conduct new studies in response to issues raised in the comments, nor is it duty-bound to resolve conflicts raised by opposing viewpoints." *Block*, 690 F.2d at 772.

On this record, the Court concludes that the Service took the requisite "hard look" at the potential negative effects of grazing on the Clear Lake suckers.

### b. Cumulative Effects

"NEPA requires that where several actions have a cumulative environmental effect, this consequence must be considered in an EIS." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (internal quotation marks, alterations, and citations omitted). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to the other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

In this case, WWP argues that the Service failed to consider the cumulative impacts of grazing on the areas surrounding the Clear Lake Refuge, particularly on the Modoc National Forest, on the sage grouse and Clear Lake suckers.  WWP contends that the Service considered the Clear Lake NWR "in a vacuum," and ignored the wider context of sage grouse and sucker populations.

With respect to the sage grouse, the Service considered that its proposed grazing would improve sagebrush to the benefit of the sage grouse.  AR 505.  "This is especially important because the Refuge and the immediately surrounding area is the core area for the sage grouse recovery in the Devil's Garden/Clear Lake Population Management Unit (Clear Lake Sage Grouse Working Group, 2010)." *Id.*  "[E]arly spring grazing and dormant-season grazing are both actions included in the conservation strategy for recovery of sagebrush habitat and sage grouse in the Devil's Garden/Clear Lake Population Management Unit." *Id.*  Besides the Service itself, the Devil's Garden/Clear Lake Population Management Unit is made up of the Bureau of Land Management, the California Department of Department of Fish and Game, the U.S. Forest

Service–Modoc National Forest, local landowners, the Natural Resources Conservation Service, and the University of California Cooperative Extension.  AR 80008.  The record shows that the Service not only considered the cumulative effects of actions in the surrounding area, but coordinated with other agencies and entities to formulate its policy with respect to the sage grouse.

With respect the suckers, the Service expressly considered the cumulative effects of grazing.  AR 3718-19; *see also* AR 126-27 ("Based on available species occurrence data, knowledge of seasonal habitat usage, discussions with species experts, and implementation of best management practices, management actions outlined above and in the CCP/EIS may affect, but are not likely to affect Lost River or shortnose suckers.").

On this record, the Court concludes that the Service appropriately considered the cumulative effects of its managed grazing program with respect to both the sage grouse and the suckers.

### e.  The Kuchel Act and the Refuge Act

Similar to its argument under NEPA, WWP argues that the Service violated the Kuchel Act by not considering alternatives under the CCP where livestock grazing at Clear Lake Refuge is reduced or eliminated.  Under the Kuchel Act, the Clear lake Refuge was to be "dedicated to wildlife conservation . . . for the major purpose of waterfowl management, but with full consideration to optimum agricultural use that is consistent therewith."  7 Pib. L. No. 88-567, 8 Stat. 850 (Sept. 2, 1964).  WWP suggests that the Service has taken the position that the Kuchel Act requires it to authorize the same levels of livestock grazing as previously permitted or that it lacks the authority to consider alternatives that would reduce or eliminate grazing.  The Record does not reflect this suggestion and the Service is adamant that it has not taken such a position.

In fact, WWP does not point to anywhere in the record where the Service has stated it believes such an assertion. Instead, the Service recognizes that under the Kuchel Act, its allowances of livestock grazing on the Refuge is subject to its consistency with wildlife conservation. AR 502.

WWP argues that the Service also violated the Refuge Act by making compatibility determinations for grazing that lack rational basis and are contrary to refuge purposes given the impacts grazing has on sage grouse, suckers, and other wildlife. As previously discussed, the Refuge Act mandates that the Service shall not allow any use of a refuge "unless [the Service] has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A).

Regarding the Service's approval of grazing on the "U," WWP argues that the Service's explanation that grazing would be used to restore sagebrush habitat for sage grouse and other species lacks support from the record. The record shows that the Service analyzed the potential impacts of grazing through an examination of scientific literature and ground observations, and determined that grazing would be beneficial to Clear Lake Refuge's habitat goals to target the presence and spread of non-native plants while minimally damaging native plants, which would support the recovery of sagebrush and species such as sage grouse. AR 502-511; *see also* AR6 947 ("Prescribed spring or fall grazing can be used as a tool to reduce the seed poll and biomass of exotic annual grasses."); AR 80038, 69470, 72338, 73878, 74136, 76355, 80000, 85699, 120581 (scientific studies supporting the Service's decision that managed livestock grazing can be used as a tool to maintain and enhance sage grouse habitat); AR 4908-09, 4918-19, 5145-46 (Service's responses to comments criticizing grazing on the Refuge). As mentioned above, the Service determined that the primary threats to sage brush habitat on Clear Lake Refuge are from western juniper encroachment and fire (AR3239), and the best management strategy to combat

these threats is to allow limited livestock grazing. The Service approved spring grazing on the "U's" upland habitat from March 1 through mid-April because the Service found that

> early or middle spring, fast-growing annual grasses like cheatgrass and medusahead can be very palatable and preferentially selected by grazing livestock over native perennial bunchgrasses. High-intensity, short-term, targeted grazing in the uplands at this time of year would preclude these exotic annual grasses from maturing, setting seeds, and reproducing, yet would be expected to minimally damage the more-slowly growing native, perennial bunchgrasses.

AR 505 (citing Strand, E.K. and K.L. Launchbaugh, *Livestock Grazing Effects on Fuel Loads for Wildland Fire in Sagebrush Dominated Ecosystem* (2013) (AR94904)). Despite WWP's best efforts to argue otherwise, the Service's explanation that grazing would help restore the sagebrush habitat is supported by the record and based on sound professional judgment.

Regarding the Service's approval of grazing on the shoreline habitat, WWP argues that the Service "failed to provide a logical explanation or rationale for allowing livestock grazing on the Clear Lake shoreline where it harms endangered suckers" and forces the sage grouse to compete for food resources. The prior 1996 Compatibility Determination considered a "no livestock grazing" alternative and found that alternative to be less desirable because although it may benefit endangered fishes inhabiting the lake, "[n]o grazing would eliminate the close cropped vegetation required by Canada geese and other migratory waterfowl and shorebirds as foraging areas." AR 64794. The Service further determined that the loss of lightly grazed exposed waterline areas would reduce the amount of preferred forage for pronghorns and sage grouse which are "refuge emphasis species." *Id.* Moreover, In January 2017, the Service completed a biological assessment ("BA") to assess how its actions under the CCP would affect endangered species on the Refuge. AR 85. WWP argues that the BA notes that grazing at Clear Lake Refuge has the potential to impact suckers and their habitat, so therefore, it supports their argument that livestock grazing harms the suckers. However, the Service points out that the BA

notes that grazing may impact sucker habitat, but ultimately concludes that there would only be minor effects from the grazing program. AR 126-27; 3571. The Service considered and discussed potential impacts to the suckers from grazing on the Refuge even though it had "no empirical data that shows current grazing practices adversely affect" sucker habitat. AR 508. The Service acknowledged that grazing on the shoreline can adversely affect aquatic environments and commits to implementing conservation measures that resulted from the intra-Service ESA consultation, which are set forth in the BA for the implementation of the CCP. AR 3571; 100-102. Therefore, the Service did provide a logical rationale for allowing livestock grazing on the shoreline habitat and did not ignore impacts to the suckers or the sage grouse.

The fact that the Service and WWP came to different conclusions about grazing and habitat management does not mean that the Service's decisions are contrary to law. WWP is asking this Court to perform its own scientific review of the studies in the record to conclude that the Service ignored important scientific evidence, but that is not the Court's role. The Court is not to substitute its scientific judgment for that of the Service, especially with "respect to scientific matters within the purview of the agency." *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (citation omitted). "An agency's actions need not be perfect; [courts] may only set aside decisions that have no basis in fact . . . ." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).

For all the reasons mentioned above, the Service's determination that grazing on the Clear Lake Refuge is compatible with the Refuge's purposes is factually based on the sound professional judgment of the Service. Therefore, the Service did not violate the Kuchel Act or the Refuge Act in making its compatibility determination for livestock grazing.

**IV.**    **CBD's Motion for Summary Judgment**

This section will address the Center for Biological Diversity ("CBD")'s challenge to the

CCP/EIS's preservation of the status quo for agricultural use of pesticides on the Lower Klamath

Refuge and the Tule Lake Refuge.  For the following reasons, the Court recommends that CBD's

Motion (#118) be DENIED and the Service's Cross-Motion (#143) be GRANTED.  The

Agricultural Plaintiff's Cross-Motion (#145) should also be DENIED.

**a.**    **Lower Klamath Refuge**

Lower Klamath Refuge was established in 1908 as a preserve and breeding ground for

native birds.  AR 3144.  "The Lower Klamath Refuge is the largest in the complex and contains a

varied mixture of intensively managed shallow marshes, open water, grassy uplands, and

croplands."  *Id.*  Lower Klamath Refuge covers approximately 50,913 acres in northeastern

Siskiyou County, California and Klamath County, Oregon.  AR 3141.

Farming on Lower Klamath is a combination of lease land and cooperative farming

program land.  The Lower Klamath Refuge "lease lands" are in Area K, which covers 6,253

acres, of which 5,605 acres are irrigated.  AR 3146.  The Lower Klamath Refuge lease land is

primarily used for grazing, haying, and the growing of barley, oats, and wheat.  AR 3380.  No

row crops[7] are grown on the Lower Klamath lease lands.  AR 3385.  Pest control on the lease

lands is handled through the 1998 Final Environmental Assessment for an Integrated Pest

Management Plan for Leased Lands at Lower Klamath and Tule Lake National Wildlife Refuges

Oregon/California (the "1998 IPM.").  *Id.*

The cooperative farmlands on Lower Klamath Refuge are used exclusively for cereal

grain cultivation, primarily barley, with the farmer agreeing to leave between 25% and 33% of

---

[7] A row crop is a crop (as corn or cotton) that is usually planted in rows.

the crop standing for wildlife consumption. AR 3146, 3374. The cooperative farmer provides all seed, fertilizer, pesticide, equipment, fuel, and labor, while the Service provides land, water, and irrigation services. AR 3374. Standing and waste grain left in farmed fields provide "a highly-sought, high-energy food source for some waterfowl species, pheasants, and sandhill cranes during the fall and early winter months." AR 3360. "A variety of management techniques are used on the refuge cooperative farmlands to combat pests and help ensure successful crop yields," including the use of pesticides. AR 3380. "Cooperative farmers are allowed to use the same suite of pesticides on the same crops and pests with the same best management practices (BMPs) as those used by individuals farming the lease lands on the refuge." *Id.* Between 2011 and 2015, less than 1,000 acres each year were chemically treated for pest control as part of the cooperative farming program. *Id.*

### b.    Tule Lake Refuge

Tule Lake Refuge was established in 1928 to serve as a refuge and breeding ground for wild birds and animals. AR 3152-53. Tule Lake Refuge covers 39,116 acres, consisting mostly of lands "reclaimed" from under the waters of the historic Tule Lake. AR 3405. "Tule Lake [Refuge] consists of two open water sumps (reservoirs totaling 13,000 acres) surrounded by croplands." *Id.* Approximately 14,800 acres of the surrounding area is farmed by lessees of the Bureau of Reclamation. *Id.* The Tule Lake lease lands are divided into 168 lots and used to grow barley, oats, wheat, onions, potatoes, and alfalfa. *Id.* Barley, wheat, and oats comprise most of the acreage, while potatoes are the dominant row crop. *Id.* All lease land crops are harvested, leaving crop residues as a major food resource for waterfowl. *Id.*

Cooperative farming on Tule Lake Refuge takes place on 2,250 acres divided into 18 lots. AR 3426. Rather than make a lease payment for use of the Refuge lands, the cooperative

farmers leave between 25% and 33% of the small grain crop standing for wildlife use. *Id.*
Cooperative farmers are permitted to grow barley, oats, wheat, potatoes, and onions. AR 3425.
The Service is currently granting longer agreements to farmers with the provision that they
transition to organic farming. *Id.*

Pesticides are permitted on both the Tule Lake lease lands and cooperative farmlands in
accordance with the IPM approach, although pesticide application on cooperative farm fields are
"relatively minor." AR 3426.

### c.    IPM and PUP

The Service adopted the 1998 IPM (Integrated Pest Management Plan) for leased lands at
Lower Klamath and Tule Lake National Wildlife Refuges. AR 110734. As part of the CCP/EIS,
the Service intends to adopt an IPM for the non-lease lands on the Refuges, known as the
Klamath Basin Nation Wildlife Refuge Complex Integrated Pest Management Program for
Cooperative Farming, Habitat Restoration, and Maintenance Activities. AR 4786 (Appendix Q).

The IPM is a scientifically based, adaptive management process and "an interdisciplinary
approach utilizing methods to prevent, eliminate, contain, and/or control pest species in concert
with other management activities on refuge lands and water to achieve wildlife and habitat
management goals and objectives." AR 4787.

> All pesticide usage (including pesticide, target species, application rate, and
> methods of application) must comply with the applicable federal (FIFRA) and state
> regulations pertaining to pesticide use, safety, storage, disposal, and reporting.
> Before pesticides can be used to eradicate, control, or contain pests on refuge lands
> and waters, pesticide use proposals (PUPs) are prepared and approved consistent
> with Service policy (569 FW 1). PUP records provide a detailed time-, site-, and
> target-specific description of the proposed use of pesticides on the refuge. All PUPs
> are created, approved, approved with modification, or disapproved, and stored in
> the Pesticide Use Proposal System (PUPS), which is a centralized database
> accessible on the Service's intranet . . . Only Service employees are authorized to
> access PUP records through this database. . . .

Cost is not the primary factor in selecting a pesticide for use on a refuge. If the lease expensive pesticide would potentially harm natural resources or people, then a different product is selected, if available. The most efficacious pesticide available with the least potential to degrade environmental quality (i.e., soils, surface water, and groundwater) and the least potential to affect native species and communities of fish, wildlife, plants, and their habitats would be acceptable for use on refuge lands in the context of an IPM approach.

AR 4794-95.

The IPM also describes the best management practices (BMPs) for the handling, mixing, and application of pesticides. AR 4796-97. BMPs are meant to minimize or eliminate potential pesticide effects to non-target species and sensitive habitats, as well as degradation of water quality. AR 4796.

Pesticides can only be used on refuge lands, including croplands, after approval of a pesticide use proposal ("PUP"). AR 4801. A PUP is a "concise document that describes the type of chemical proposed for use, the pest intended for control, the general treatment site, and any sensitive areas near the treatment site that may need special attention." AR 3385. "Ecological risks assessments as well as characteristics of environmental fate and potential to degrade environmental quality for pesticides are documented in Chemical Profiles." AR 4801. "In general, only pesticide uses with appropriate BMPs . . . that would have minor, temporary, or localized effects on refuge biological resources and environmental quality (threshold values not exceeded) are approved." AR 4801-02.

The PUPs that authorize the use of pesticides on the Refuges' lease lands are prepared at the beginning of the agricultural season after review by the Lease Land PUP Committee. AR 3386. "These pesticides are authorized specifically for agricultural use whether on lease lands or cooperative farming units." *Id.* Although up to 100 PUPs may be authorized each year, less than half of the approved pesticides are used. *Id.* The application of pesticides is tracked at the

Refuge Complex level based on the use numbers submitted by the farmers. *Id.* Pesticide application will vary according to availability of water and weather conditions. *Id.* Fallowing of fields allows weeds to grow, which results in additional pesticide use in following years. *Id.* A wet spring season also increases the number and type of pests to be controlled. *Id.*

### d.    Incorporation of IPM and PUP in the CCP

The CCP/EIS considered a number of alternatives for management of the Refuges. A number of features were common to all of the alternatives considered for management of Lower Klamath and Tule Lake Refuges. Among these was an adaptive management approach, under which the Refuge managers and biologists would be able to adjust management "as on-the-ground monitoring reveals the results of previous habitat management practices, as other new information is developed, or as the needs of waterfowl populations change." AR 3192 (Lower Klamath); 3245 (Tule Lake).

"Conservation planning for migrating and wintering waterfowl is based on the fundamental premise that food is the resource that limits population performance." AR 3192. Farming was therefore also included in all considered alternatives. AR 3196-97; AR 3247-48. This includes the use of pesticides consistent with the IPM approach, described in the preceding section. AR 3197 (Lower Klamath) 3248 (Tule Lake).

The parties agree that all alternatives rely on the PUP process to determine whether a particular pesticide may be applied on the Refuges. For Lower Klamath Refuge, Alternative A, the "No Action" alternative, involved (1) pest management guided by the 1998 IPM; (2) chemical applications evaluated and permitted through the PUP process; (3) mapping and controlling priority weed species with an emphasis on protecting high-priority wildlife habitats;

(4) reduce populations of nuisance species; and (5) use flood fallow agricultural practice in management units every five to eight years as needed manage invasive plants. AR 3229.

Lower Klamath Refuge Alternative B is "Same as A" with the addition of (1) formalizing ongoing pest management for cooperative farming and general pest management activities under an IPM program; (2) using GPS to monitor weed populations; (3) expanding the use of non-pesticide tools for controlling invasive species in wetland and upland units; and (4) developing a program for managing berms to reduce invasive species cover and improve cover for nesting waterfowl and other species. AR 3229. Alternative D is identical to Alternative B with respect to pest control. *Id.*

Lower Klamath Refuge Alternative C, the Service's preferred alternative, is "Same as B" with the addition of "pursuing a partnership with the states of California and Oregon to develop and operate a portable decontamination station(s) near boat launches on the refuge" to prevent the introduction of aquatic invasive species. AR 3229.

Three alternatives were considered for pest control on Tule Lake Refuge. Alternative A, the "No Action" alternative, involves (1) pest management on lease land farming guided by the 1998 IPM; (2) chemical evaluation and permitting of pesticides through the PUP process; (3) reducing the populations of nuisance species; (4) scouting, mapping, and controlling priority weed species with an emphasis on protecting high-priority wildlife habitat; and (5) periodically monitoring refuge waterbodies for pesticides.   AR 3267.

Tule Lake Refuge Alternatives B and C are identical with respect to pest control and are the "Same as A" with the addition of (1) formalizing pest management for cooperative farming and general pest management activities under an IPM program; (2) developing a program for managing berms to reduce invasive species cover and improve cover for nesting waterfowl; (3)

using GPS to monitor invasive plant populations and treatment actions; (4) partnering with

Oregon and California to develop and operate a decontamination station near boat launches to

prevent the introduction of invasive species; and (5) periodically conducting water, sediment,

and fish and wildlife monitoring in refuge waterbodies to ensure pesticides are at concentrations

below those having an adverse effect to listed species and other wildlife. AR 3267. Alternative

C is the Service's preferred alternative. *Id.*

### e.    NEPA

CBD alleges the Service violated NEPA by (1) failing to consider alternatives to the

status quo usage of pesticides; (2) failing to take a hard look at the direct, indirect, and

cumulative effects of the use of pesticides on the Refuges; and (3) deprived the public of

meaningful participation in the decision-making process by failing to provide high quality

information in the CCP/EIS. Agricultural Plaintiffs contend that CBD lacks standing to maintain

this challenge.

#### i.    Standing

"To establish standing, a plaintiff must show that (1) he or she has suffered an injury in

fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable

to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court

decision." *WildEarth Guardians*, 975 F.3d at 1154 (internal quotation marks and citation

omitted). In this case, the Agricultural Plaintiffs contend CBD cannot demonstrate an injury in

fact that is concrete and particularized and actual or imminent because CBD cannot trace a

connection between individualized pesticide use and specific environmental harm.[8]

---

[8] There is no challenge to CBD's organizational standing to act on behalf of its members.

"The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). "[A]n individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Id.* at 1149. "A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressability." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008). "Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Id.* (internal quotation marks and citation omitted, emphasis in original).

CBD has submitted declarations from its members describing their use and enjoyment of Lower Klamath and Tule Lake Refuges. CBD member Jeffery Miller described visiting the refuges for bird-watching and affirms that he has "a personal and professional interest in seeing and experiencing the native bird and wildlife species and habitats in the complex, and will be harmed if these species do not return or their health is impaired because of exposure to agricultural pesticides on its refuges." Miller Decl. (#122). CBD member Brett Hartl similarly describes his use of the refuges to observe wildlife and "enjoy the aesthetic beauty of these public lands." Hartl Decl. (#123). Hartl affirms that he intends to return to the refuges in an effort to observe the Yellow Rail bird and that he has "dedicated my life to the preservation, protection, and restoration of biodiversity, native ecosystems, and public lands, and I am very

concerned that the Service's failure to adequately analyze, consider, and prevent the use of

agricultural pesticides in the Klamath Basin National Wildlife Refuge Complex will adversely

affect those interests and my life's work." *Id.*

On this record, CBD has shown that its members have a connection to the Refuges and an

interest in their recreational and aesthetic value. CBD has also demonstrated a credible

contention that the continued use of pesticide on the refuges presents a real risk that its members'

interest in the refuges will be impaired. CBD is not, as the Agricultural Plaintiffs suggest,

required to demonstrate a specific environmental harm flowing from pesticide use in order to

establish standing. *See Ecological Rights Found.*, 230 F.3d at 1151 ("Requiring the plaintiff to

show actual environmental harm as a condition for standing confuses the jurisdictional inquiry

(does the court have the power under Article III to hear the case?) with the merits inquiry (did

the defendant violate the law?)"). The Court also notes that CBD is asserting a procedural injury

with respect to the Service's decision to allow the continued use of pesticides on the Refuges.

CBD is therefore only requited to show that it has a procedural right that, if exercised, could

protect its members' interests. *See Salmon Spawning*, 545 F.3d at 1226. The Court concludes

that CBD has made the required showing and that it has standing to maintain this challenge.

### ii.    Consideration of Alternatives

As noted, an EIS must "[r]igorously explore and objectively evaluate all reasonable

alternatives" to the proposed agency action. 40 C.F.R. § 1502.14(a). However, an EIS "need not

consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel-By-

The-Sea*, 123 F.3d at 1155. "The 'rule of reason' guides both the choice of alternatives as well

as the extent to which the Environmental Impact Statement must discuss each alternative." *Id.*

The reasonable range of alternatives is also guided by the "purpose and need" of a project. *League of Wilderness Defenders-Blue Mountain Biodiversity Project*, 689 F.3d at 1069.

In this case, CBD contends that all the alternatives continue the status quo with respect to the approval and use of pesticides on the refuges and that the Service failed to consider any alternatives that would have reduced or eliminated the use of pesticides. For example, CBD argues that the Service should have considered a prohibition on certain types of insecticide or restricting the cultivation of pesticide-intensive row crops like onions and potatoes.

The formulation of alternatives must be guided by the purpose and need of the project. As part of the CCP/EIS for Lower Klamath and Tule Lake Refuges, the Service was obliged to consider and incorporate the requirements of the Kuchel Act into its purpose and need analysis. The Service concluded that proper waterfowl management was the major purpose of the Kuchel Act, with additional secondary purposes related to agriculture. AR 3186. Among those secondary agricultural purposes, the Service concluded that it was obliged to continue the "present pattern of leasing," if consistent with waterfowl management. *Id.* "For the 'present pattern of leasing' to be consistent with proper waterfowl management, the service determined that the overall program must provide sufficient food resources to support population objectives for waterfowl (dabbling ducks and geese) during the spring and fall migration." *Id.* "In addition, post-harvest farming practices and other practices must be implemented in a way that will increase the attractiveness of fields for foraging waterfowl and disperse waterfowl use as widely in the leased lands as possible." *Id.*

Consistent with that purpose and need, the Service determined that any alternatives must be formulated in such a way as to provide enough forage for waterfowl on the refuges. The Service explored the waterfowl food needs in an extensively documented bioenergetics model.

AR 4556.  The Service used that information to guide its formulation of alternatives to ensure a

sufficient supply of forage for the waterfowl populations.  AR 3188-89 (Lower Klamath); 3190-

91 (Tule Lake).  The Service contends that the elimination of pesticides would result in the loss

of forage grains for migrating waterfowl and the expansion of nuisance weeds into waterfowl

habitat.

CBD raised its objection to lack of pesticide-reducing alternatives during the comment

period for the CCP/EIS, arguing that the Service "should also include alternatives that would

result in reduction of pesticides, which would also assist in reaching the goal of all agricultural

uses managed organically.  These alternatives could include prohibition of the use of insecticides

on all lease lands and cooperative units and prohibition of crops that intensively use pesticides,

such as onions and potatoes, and other row crops."  AR 5162.  In response, the Service stressed

that, while chemical pesticides were an option of last resort, they remained a necessary tool for

pest control, saying

> The highly alternated nature of the refuge environment and surrounding area
> necessitates a wide range of tools for IPM (see 569 FW 1), including the application
> of pesticides when warranted.  Therefore, the Service believes it is unreasonable to
> include the prohibition of synthetic chemical pesticides in the action alternatives.
> Such an alternative was considered and but regected [sic] in the 1998
> Environmental Assessment for the Integrated Pest Management Program for
> Leased Lands at Lower Klamath and Tule Lake National Wildlife Refuges.  While
> desirable, the Service will not make organic agriculture a strict requirement of
> either lease land or cooperative farm units because organic agriculture is dependent
> on a consistent water supply and external economic forces that are beyond our
> control.  The Preferred Alternatives at both Lower Klamath and Tule Lake Refuges
> would include expanding incentives such as lease extensions for farmers that
> manage fields organically.  Each of the alternatives includes strategies to reduce the
> use of pesticides through IPM.  These tools range from flood/fallow for quackgrass
> control on Lower Klamath Refuge to grazing, mowing, and prescribed burning, to
> walking wetlands on Tule Lake NWR, in addition to incentives for organic
> agriculture on both of these Refuges.

AR 5162.

As noted in that response to CBD's comment, the Service expressly relied on the findings made during the formulation of the 1998 IPM with respect to pesticide usage. The long-term goal of the 1998 IPM program was "to minimize the use of pesticides associated with agricultural practices on the leased lands over time." AR 111206. During the development of the 1998 IPM, one of the alternatives the Service considered was transitioning from synthetic pesticides to long-term organic management. AR 111226. The Service rejected that alternative in part because it would result in a substantial reduction of grain stubble for waterfowl feeding, which would result in "a major and irretrievable impact on waterfowl." AR 111288-89. The Service also considered an alternative that called for substantially reduced pesticide use, but rejected that alternative as impractical because it would result in the loss of crops and wildlife habitat due to pests, including noxious weeds. AR 111231.

"Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters." *Westlands Water Dist.*, 376 F.3d at 871 (quoting *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989)). In formulating the alternatives in this case, the Service carefully weighed its options against the need to ensure an adequate supply of food for waterfowl on the refuges. It reasonably concluded that eliminating or substantially reducing the use of pesticides would result in an irretrievable loss of forage for birds on the refuges. This is precisely the sort of scientific judgment that entitles the Service to deference. On this record, the Court cannot conclude that the Service erred by failing to consider the alternatives proposed by CBD.

### iii.    Hard Look

NEPA imposes procedural requirements "designed to force agencies to take a 'hard look' at the environmental consequences" of the proposed action. *Lands Council*, 395 F.3d at 1027.

In this case, the Service concluded that the adverse effects to fish and wildlife from pesticide application were minor. AR 3618, 3524, 3552 (Lower Klamath), 3636 (Tule Lake). In reaching this conclusion, the Service considered the analysis and conclusions of the 2007 Biological Opinion Regarding the Effects on Listed Species from Implementation of the Pesticide Use Program on Federal Leased Lands, Tule Lake and Lower Klamath National Wildlife Refuges (the "2007 BiOp"). AR 3523. As previously discussed, the Service also contemplated continued adherence to the 1998 IPM, for which the Service completed an Environmental Assessment ("EA") in November 1998. AR 110736.

For Lower Klamath Refuge, the Service noted that "recent studies have not linked wildlife mortalities on the refuge to pesticide use." AR 3615. Pesticide monitoring conducted in 2007 and 2011 showed that "of the pesticides applied to croplands at Tule Lake Refuge, only a few are present in the waterbody and at concentrations low enough that they should not be adversely affecting fish within the lake." AR 3615.

CBD contends that the Service failed to take a "hard look" at the environmental effects of pesticides by (1) relying on the PUP process and a 2007 biological opinion to support a finding of minor effects on refuge resources from pesticides; (2) making general statements about environmental effects without analysis or scientific integrity; and (3) failing to disclose and analyze the cumulative effects of pesticide use.

### A. Pup Process and 2007 Biological Opinion

CBD argues that the Service improperly relied on the 1998 IPM's PUP process and the 2007 BiOp to conclude that the agricultural use of pesticides on the refuges would have minor effects. CBD contends that the Service improperly tiered these documents into the CCP/EIS as a substitute for undertaking its own analysis.

> Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28.

In particular, CBD argues that the 2007 BiOp and the various site-specific PUP determinations were not subject to NEPA. The Ninth Circuit has held that "[a] NEPA document cannot tier to a non-NEPA document." *Klamath-Siskiyou Wildlands Cntr.*, 378 F.3d at 998.

In response, the Service argues that it did not utilize specific PUP determinations in formulating the CCP/EIS, but rather considered the 1998 IPM EA, which described the approach for pest management on lease land and described the process for approving specific pesticides for use on the Refuges. AR 110734.

The Service further argues that it did not tier the 1998 IPM EA or the 2007 BiOp, but instead incorporated those documents by reference as sources for its own "hard look" at the effects of pesticides in formulating the non-lease land IPM contained in Appendix Q of the CCP/EIS and in reaching its conclusions concerning the effects of pesticide use on the Refuges. Such incorporation by reference is permitted in a NEPA analysis "when the effect will be to cut down on bulk without impeding agency and public review of the action." 40 C.F.R. § 1502.21. Incorporated material should be cited in the statement and its content briefly described and the material must be "reasonably available for inspection by potentially interested persons within the time allowed for comment." *Id.*

The fact that the document to be incorporated was not itself subject to NEPA, or that it involved different standards (such as an ESA analysis) are not bars to incorporation by reference. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) ("Clearly

NEPA and the ESA involve different standards, but this does not require USFS to disregard the findings made by FWS in connection with formal consultation mandated by the ESA."); *Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp.2d 1221, 1247 (D. Or. 2009) (holding same). An agency may utilize a non-NEPA document, such as a BiOp, as part of its own NEPA analysis. *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1012 ("Moreover, USFS did not rely solely on the 'no jeopardy' conclusion, but on all of the analysis contained in the BiOp, as well as numerous other sources of information.").

In this case, the Service did not tier the 2007 BiOp or the 1998 IPM EA in drafting the CCP/EIS. Rather, it appropriately incorporated those documents and their analyses by reference and used the analyses from the documents, along with other sources, to support its conclusions concerning the effects of agricultural pesticide usage. *See, e.g.,* AR 609-10 (summarizing studies of pesticide use on water quality); 3305-07 (summarizing studies conducted in 2007 and 2011 focused on identifying if pesticides were present in Tule Lake).

### B. Scientific Integrity and Cumulative Effects

"NEPA requires that where several actions have a cumulative environmental effect, this consequence must be considered in an EIS." *Te-Moak Tribe of W. Shoshone of Nevada*, 608 F.3d at 602 (internal quotation marks, alterations, and citations omitted). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to the other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

"Agencies shall insure the professional integrity, including scientific integrity, of the

discussions and analyses in environmental impact statements. They shall identify any

methodologies used and shall make explicit reference by footnote to the scientific and other

sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24. The discussion of

methodology may be placed in an appendix. *Id.* "To 'consider' cumulative effects, some

quantified or detailed information is required. Without such information, neither the courts nor

the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the

hard look that it is required to provide." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137

F.3d 1372, 1379-80 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk'

do not constitute a 'hard look' absent a justification regarding why more definitive information

could not be provided." *Id.* at 1380.

In this case, the Service provided a series of tables listing the pesticides in use or

proposed for use and the acreage involved on the Lower Klamath Refuge in Tables 5.15, 5.16,

5.17, and 5.18, AR 3380-85, and for Tule Lake Refuge in Tables 5.24, 5.25, 5.26, and 5.27,  AR

3426-35. The Service also compiled Table 5.19, which summarized the pesticide application

acreage for Lower Klamath and Tule Lake between 2008 and 2014. AR 3386. In response to

comments, the Service also compiled a spreadsheet listing pesticides, their use, EPA number,

active ingredient, chemical family, mode of action, and restriction on use. AR 9666-9926. As

discussed in the previous section, the Service appropriately considered the analyses of the 1998

IPM EA and the 2007 BiOp, as well as numerous other sources in reaching its conclusions. *See,*

*e.g.,* AR 609-10 (summarizing studies of pesticide use on water quality); 3305-07 (summarizing

studies conducted in 2007 and 2011 focused on identifying if pesticides were present in Tule

Lake). Based on the collected data, the Service concluded that "[w]hen applied consistent with

PUP-directed BMPs, the concentration of pesticides in refuge waters would not be expected to be high enough to adversely affect waterbirds or other species of special management attention. Impacts to water quality from pesticide application would be minor." AR 3598; *see also* AR 3617 ("Because the Service would follow all pesticide label restrictions and BMPs (see Appendices G, L, and Q), pesticides would not be applied directly to, or within the no-spray buffer of, surface waters. Therefore, indirect impacts to aquatic and terrestrial species that use refuge aquatic resources for food, cover, nesting, etc. would not be likely to occur." (footnote omitted)).

This is a not a situation like *Neighbors of Cuddy Mountain*, where the agency provided only generalities without quantified or detailed information. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1379-80. The Service has provided the necessary information to demonstrate that it took a hard look at the effects of pesticide use on the Refuges. The Service's substantive conclusions based on that information fall within its areas of technical and scientific expertise and are entitled to deference.

### C. Public Participation

Finally, CBD asserts that the Service has deprived the public of participation in the CCP/EIS decision-making process by relying on stale and uncertain studies to support its conclusions.

As discussed in the preceding sections, the Service relied on numerous studies and historical surveys of pesticide usage in formulating the CCP/EIS. In reaching its conclusions, the Service recognized some gaps in its data. AR 3492, 3598. The Service also discussed the practical difficulties of collecting certain data. *See, e.g.*, AR 4817-18. A "definitive" study is not required, however. Nor is the agency required to undertake new studies in order to fill in

additional details.  Rather, an agency must use studies sufficient to permit a reasoned decision. *Churchill Cnty.*, 276 F.3d at 1081-82.  On this record, the Court concludes that the Service relied on and disclosed to the public sufficient studies and data to permit a reasoned decision and informed public participation.

In this case, the Service recognized the need for additional monitoring and all the preferred alternatives include data collection and monitoring with respect to pesticide usage.  The fact that the Service recognizes the value of additional monitoring did not deprive the public of the right to meaningful participation in the formulation of the CCP/EIS.

### f.    The Refuge Act and the Kuchel Act

CBD argues that the Service violated the Refuge Act and Kuchel Act because the Service's Compatibility Determinations are arbitrary "for the same basic reasons that the Service has failed to comply with NEPA." CBD's Br. at 34 (#118).  CBD argues that the Refuge and Kuchel Acts require the Service to consider the direct, indirect, and cumulative impacts associated with the use of pesticides. For the same reasons discussed in the previous sections, the Service did consider the cumulative impacts of pesticide use and complied with the Refuge Act and the Kuchel Act by reasonably determining that the agricultural programs for pesticides and certain row crops were compatible and consistent with the Refuge purposes.

## RECOMMENDATION

For the reasons stated above, the Court concludes that the Service complied with NEPA, the Refuge Act, the Kuchel Act, and the Clean Water Act in adopting the CCP, and therefore, recommends ruling in favor of the Service on all claims.  The following motions and cross-motions for summary judgment should be DENIED: ##98, 102, 110, 118, 145. The following motions and cross-motions for summary judgement should be GRANTED: ##143, 146, 157,

159, 161, 162.  The Agricultural Plaintiff's cross-motion (#148) should be GRANTED in part and DENIED in part.  Motions ##109, 130, 147, and 196 should be DENIED.

This Report and Recommendation will be referred to a district judge.  Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed.  If objections are filed, any response is due within fourteen (14) days after the date the objections are filed.  *See* Fed. R. Civ. P. 72, 6.  Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this _____ day of November, 2019.

_____
MARK D. CLARKE
United States Magistrate Judge